[No. 29868. Department Two. August 15, 1946.]

GUY A. ARMITAGE, *Appellant*, v. ANN TRACY HOGAN *et al.,*
*Respondents.*[1]

*Glen S. Corkery*, for appellant.

*E. K. Marohn* and *Paul S. Dubuar*, for respondents.

JEFFERS, J.—This action was instituted by Guy A.
Armitage against Ann Tracy Hogan, alias Tracy Lizar,
alias Mrs. Joe Ennette, alias Mrs. Guy A. Armitage, Howard
F. Smith and Elizabeth Smith, his wife, and Samuel Israel,
in January, 1945. The theory of the complaint, in so far as
defendant Ann Tracy Hogan is concerned, is shown by the
following allegations of the amended complaint.

It is alleged that defendant Ann Hogan and plaintiff
entered into an agreement to marry, no definite time being
fixed for the ceremony; that such agreement was entered
into about the time of and prior to the purchase by Ann

[1]Reported in 171 P. (2d) 830.

Hogan, from defendant Smith and wife, of the Drexel hotel; that in consideration of such marriage agreement, and in consideration of the mutual promises to marry, plaintiff bought and paid for and gave to defendant a diamond engagement ring of the value of two thousand dollars; that plaintiff also agreed to finance for defendant the purchase of the Drexel hotel, consisting of the fixtures, equipment, and good will, together with an assignment of the lease on the hotel building from defendant Israel to Guy Armitage, to be held as security for the repayment of money advanced by plaintiff in financing the purchase of the hotel.

It is further alleged that pursuant to the marriage agreement, plaintiff paid by check to the agent of defendants Smith and wife the sum of twenty-five hundred dollars, as a down payment on the purchase of the hotel, and, on July 21, 1944, Smith and wife and Ann Hogan entered into a written contract of purchase of the hotel; that Ann Hogan entered into possession of the hotel property and has since conducted such business.

It is also alleged that Ann Hogan failed to make the payments required of her under the contract with the Smiths, and that plaintiff paid the entire balance of twenty-five hundred dollars owing to Smith and wife.

It is further alleged that, as part of the financing arrangement for the purchase of the hotel, Ann Hogan was to operate the hotel, and, from the net earnings, she was to repay plaintiff the first down payment of twenty-five hundred dollars at the rate of fifty dollars per month, which it is alleged she has failed to do. It is also alleged that she failed to make any payments to the Smiths, except two payments totaling five hundred dollars.

It is also alleged that, in consideration of plaintiff paying the final balance on the contract of twenty-five hundred dollars, defendant agreed to repay the same to plaintiff at the rate of three hundred dollars per month from the earnings of the hotel.

It is then alleged that, in promising to marry plaintiff, defendant did so solely with the intention of deceiving plaintiff and defrauding him of his money, and inducing

him to purchase the diamond ring and finance the purchase of the Drexel hotel; that defendant Ann Hogan never intended to marry him, but intended to and did marry Joe Ennette; that plaintiff believed in her promise to marry him and in her promise to repay him the money advanced to purchase the hotel; that he relied thereon and was induced thereby to give her the ring and advance to her the sums as aforesaid, which sums she has failed and refused to repay him.

Plaintiff prays that the contract of purchase entered into between the Smiths and Ann Hogan be set aside, that plaintiff be declared to be the rightful party in interest and his name be inserted in the contract, and that the Smiths be ordered to execute and deliver to plaintiff a bill of sale of the furniture and fixtures, business, and good will of the Drexel hotel, together with an assignment of the lease from Samuel Israel. Plaintiff further asks that the diamond ring be returned to him, or in case that cannot be done, that he be given judgment against Ann Hogan for two thousand dollars; that, in the event the Drexel hotel, its lease, furniture, and fixtures cannot be transferred to him, he be given judgment against Ann Hogan, or Ann Ennette, for the sum of $5,351.24.

As to defendant Israel, it is alleged that, in connection with the contract of sale executed by the Smiths and Ann Hogan, the Smiths furnished to Ann Hogan a letter from defendant Israel, the owner of the hotel building, stating that he would consent in writing to the transfer of the lease held by the Smiths to Mrs. Guy Armitage, defendant Ann Hogan having represented to Henry Broderick, Inc., the agent of defendant Israel, that she was Mrs. Guy Armitage, and having requested the assignment of the lease to be made to her under the name of Mrs. Guy Armitage, instead of to plaintiff, as agreed between plaintiff and Ann Hogan. It is further alleged that Samuel Israel has not delivered to anyone his consent to such assignment.

It is further alleged that Samuel Israel is about to deliver this written consent to the assignment of the lease to Ann

Hogan, under the name of Mrs. Guy Armitage, and unless restrained from so doing, plaintiff will lose such security.

As to the Smiths, it is alleged that they have not assigned the lease to Ann Hogan, or to Mrs. Guy Armitage, or to anyone, and relief is asked against them as hereinbefore set out.

Defendant Israel made no appearance in the action. Defendant Ann Hogan filed an answer in which she denied all the material allegations of the complaint. Defendants Howard Smith and wife filed a separate answer, wherein they admit that defendant Israel is the owner of the Drexel hotel; admit that they entered into conditional sales contract with Ann Hogan, and that defendant Ann Hogan took possession of the hotel property and has since conducted such business; admit that a letter was furnished to Ann Hogan, signed by defendant Israel, stating that he would consent to a transfer of the lease to Mrs. Guy Armitage, who is the same person as Ann Hogan; allege that the lease has been assigned to defendant Ann Tracy Hogan; and deny the other material allegations of the amended complaint.

The cause came on for hearing before the court in October, 1945. The greater part of the testimony was given by plaintiff and defendant Ann Hogan.

Plaintiff, at the time of trial, was a man fifty-four years of age. He was a traveling shoe salesman and spent a good deal of time in Seattle, where he lived at the Vance hotel. He had been married for a number of years but had not lived with his wife for four or five years. However, he was not divorced and had taken no steps to obtain a divorce.

According to his testimony, plaintiff met defendant Ann Hogan about three or four years prior to the date of trial. In his direct examination, he was not sure where or how he met her, but on redirect examination he at least intimated that he met her at the Green Apple Pie Cafe. Defendant's version of how they first met and what happened thereafter is as follows:

"Well, I was walking on Pike Street, and I ran into him, and I spoke to him, and we stopped to chat. And he said

he was lonesome and invited me to come to the hotel, and I went, and he paid me for my entertainment, and I stayed, and I got ready to leave. He didn't want me to go, so I remained overnight, and he give me money, and I stayed."

As near as we can tell, these parties first met in 1942, and thereafter every time plaintiff was in Seattle he would either call defendant or get in touch with her and she would go to the Vance hotel and stay with plaintiff much of the time he was in the city. Defendant was admittedly a common prostitute and had practiced her profession in Seattle and other cities for a number of years. She testified that plaintiff, at all times, from the first night she entertained him at his hotel, knew what she had been and was doing. It appears without contradiction that, from the time these parties first met, on almost every occasion plaintiff was in Seattle, he would give defendant some present, or she would ask for and receive money from plaintiff. It is undisputed that plaintiff bought defendant a fur coat and other expensive gifts. He gave her five hundred dollars to buy a massage parlor, and at another time three hundred seventy-five dollars when her sister was sick. On a number of occasions, he gave her from two to three hundred dollars when she asked for it.

Plaintiff admits that many of the things he gave her, as well as money, were gifts; in fact, he does not claim that anything bought for her or any money she obtained from him were other than gifts until we come to the diamond ring and the money he gave her to purchase the lease and furnishings of the Drexel hotel. Plaintiff stated that defendant always presented herself in a ladylike manner, and that he had no idea she was a prostitute.

The record is not too clear as to the exact date, but, as near as we can determine, plaintiff claims defendant promised to marry him sometime in July, 1944, and that he believed at that time she wanted to marry him. Defendant testified that plaintiff never asked her to marry him, in fact, nothing was ever said by either of them about marriage; that she never thought plaintiff wanted to marry her;

that he told defendant he was a wealthy man and could retire at any time.

Defendant's version of what led up to the purchase of the lease on the Drexel hotel, together with the fixtures and furnishings, is as follows:

"A. One morning in the Vance when we waked up, he said, 'I would sure be glad if we could find a place we could be together,' when he was in the city, 'where I wouldn't have to see anybody else but him, where we could cook.' I said I certainly would like a place where I could make a legitimate living, and he told me to look and see if I could find something of that character, and I told him I would like a small hotel or apartment. He told me to look, and I did look, and I found it, and he gave me the $2500 to pay down on it. . . . Q. Was there any talk about paying any part of that back? A. No, there wasn't."

Defendant testified she made two payments of two hundred fifty dollars each on the contract of purchase, leaving a balance due of twenty-five hundred dollars.

"Q. And then was the—did the matter of the other $2500 come up? A. Yes, that was in October. Q. Just tell the court about when that came up, and what was said between you and the plaintiff? A. Told him that $250 payments each month and my other overhead I couldn't realize very much out of it, and I asked him if he wouldn't finish paying it for me, and he paid it. Q. And what did he have to say when he was asked if he would pay it? A. He said, 'Well what will you do for me if I pay this other $2500?' I said, 'I would be nice to you like I have always been. Haven't I been nice?' Shortly afterwards I received a letter after he left telling how nice I had been with him. . . . Q. Was there any other arrangement except as you stated? A. No there wasn't."

John Koegel had charge of the deal concerning the purchase of the Drexel hotel lease and furnishings. He testified concerning the conditional sales contract entered into by the Smiths and Ann Tracy Hogan. This contract was executed July 21, 1944. Mr. Koegel stated he never saw plaintiff; that the whole deal was made with Ann Hogan; that she looked at the property one day and said she would take it, and the next day she came back with a check for

twenty-five hundred dollars signed by Guy Armitage; that, when he noticed the check was not signed by defendant, he asked her about it and she stated: "Yes, my friend gave me that, so I could buy the hotel."

The contract of sale was made to Ann Tracy Hogan. At the time the contract was entered into, the Smiths were renting the hotel building on a month to month basis. Apparently in order to be sure that Mr. Israel, the owner of the building, would agree to a change of tenants, on July 24, 1944, the Smiths secured from Mr. Israel a letter in which it is stated:

"I understand that you are selling your furniture and hotel business to Mrs. Guy A. Armitage, and I agree to transfer your tenancy or lease to her upon your request."

This letter was given to Ann Hogan.

On October 2, 1944, Samuel Israel, as lessor, and Howard F. Smith, as lessee, entered into a written lease of the Drexel hotel for a term of three years from November 1, 1944. This written lease was apparently made pursuant to an understanding between Mr. Israel and Mr. Smith, and contained the following endorsement:

"Lessor agrees to assign this lease to Mrs. Guy A. Armitage upon request of lessee, provided lessee has not violated any of the terms or agreements contained herein."

Mr. Smith stated he had no dealings with Mr. Armitage relative to the purchase of the hotel.

A. S. McCrary, an employee of Henry Broderick, Inc., which company managed the hotel property for Mr. Israel, testified that the hotel had been rented to Howard Smith on a month to month tenancy, with the agreement that a lease would be given to him. We quote first from the direct examination of Mr. McCrary:

"Q. Did you see a woman who represented herself as being Mrs. Guy Armitage at your place of business? A. Yes. Q. Who would that woman be, Mrs. Ann Hogan? A. Yes, she came in with Mr. Smith. Q. And she represented herself as Mrs. Guy Armitage? A. Well, she must have. I wrote it that way."

On cross-examination:

"Q. Henry Broderick & Co. collected $17.50 from Ann Tracy Hogan, did they not, for the transfer of this lease? A. I believe we did."

The witness was then asked why the transfer had not been completed, to which he answered that, just before Mr. Israel approved the assignment from the Smiths, he (Israel) heard there was some controversy over whether the lease should be transferred to Mrs. Guy Armitage, and he told Broderick & Co. he was going to hold up his consent to the transfer until the matter was settled. The witness further stated, after examining a letter written on December 7, 1944, that he wrote Mr. Israel as follows:

" 'Recently we drew a transfer of the lease on the Drexel hotel, which transferred the tenancy from Howard F. Smith to Mrs. Guy Armitage. We believe that we mailed these transfer forms to you after being signed by both of these tenants. Will you please look in your papers and see if you find them, returning them to us, keeping one copy.' "

The witness stated: "That was when he told us, I believe, the reason he was holding them up."

It is apparent that at the time the letter last above referred to was written, the Smiths had been paid in full the fifty-five hundred dollars agreed to as the purchase price of the fixtures and equipment of the Drexel hotel, and they had assigned the lease to Mrs. Guy Armitage and had requested Mr. Israel to approve the same. The Smiths had, then, prior to the date of the trial, done all that they had agreed to do, and no longer had any interest in the Drexel hotel lease or the furniture and equipment sold to Ann Hogan. When the case reached the point where the above situation appeared, it is apparent that no relief could be obtained by plaintiff against the Smiths, and the court properly dismissed them from the action.

We now revert to the situation surrounding the purchase of the diamond ring in September, 1944. At this time, defendant had taken possession of the Drexel hotel, and, when plaintiff was in the city, according to defendant, he occupied a room with her. Plaintiff admits that he lived at the Drexel

when he was in the city, but denies that he occupied the same room with defendant. Defendant testified:

"A. That morning we were lying in bed in the Drexel Hotel, and I told him, 'Let's get up early,' and wanted him to go and buy me something. So we went to Dootson's for breakfast, and he kept asking me what I wanted him to buy me, and I wouldn't tell him until we got down there, and I told him it was in the papers and that I had seen the ring, and so when we got to the jewelry store, I said, 'Here it is,' and so we asked to show the ring I had looked at, and they showed it. He said it was too much, so the man cut the price of the ring, and he bought it, and so we left the jewelry store and were waiting for the red light at Fifth and Pike. He said, 'I should have waited a little while and bought this for your Chrismas gift.' I said, 'That's fine. We'll call it a Christmas gift anyway.' He said, 'Would you?' And I said, 'Yes.' Q. Was there any talk about being an engagement ring at any time? A. Never."

Ray Sonnenberg, who sold the ring, testified that the next day after the sale defendant came into the store with a colored man and wanted him to take the stone out of the large ring and put it in the ring worn by the colored man, but that he talked them out of it.

Plaintiff paid two thousand dollars for the ring. The colored gentleman who was with defendant in the jewelry store was Joe Ennette, whom defendant married in November, 1944.

Defendant testified that plaintiff never introduced her to any of his friends, and that much of their time together was spent in the hotel or plaintiff's room.

In his brief, appellant (plaintiff) states that this action is based on fraud and deceit. On cross-examination, plaintiff was asked:

"Q. Then, upon what theory do you base fraud? (Objection) A. Well, he interrupted and what's the question. Well, that she promised to marry me, and—(Objection) THE COURT: He may answer that question. A. That she promised to marry me, and she never did intend to. And she obtained this money under the promise of marriage."

Plaintiff's testimony in regard to the purchase of the diamond ring and the lease and fixtures of the Drexel hotel

was practically the same as the allegations of his amended complaint. He admitted that he associated and lived with defendant when he was in Seattle, but not to the extent testified to by defendant.

It does not appear that plaintiff ever demanded a return of the gifts he had made to defendant or the money furnished her until about the middle of January, 1945, at which time he had discovered that defendant had married Joe Ennette, and, at which time, plaintiff told defendant he was quitting.

Plaintiff admitted that he never saw the conditional sales contract hereinbefore mentioned.

We quote again from the direct testimony of plaintiff:

"Q. Was there any reason why you should give her this money and these gifts than what you have already testified? (Objection) THE COURT: He may answer. A. No, nothing other than the marriage agreement which was inducement for me to make these loans and gifts."

At the conclusion of the case, the trial court summed up the situation as it appeared to him, as follows:

"The question is whether your client [plaintiff] gave this money to this woman, or whether he extended it to her upon the promise of marriage, or whether she committed fraud in obtaining this vast sum of money from him. That is the sole question.

"As I have listened to this testimony now for more than two days, I am satisfied that this is a case solely of a scheming woman who is engaged in prostitution, a woman of the very lowest order, having met the plaintiff and peddled her wares, and apparently Mr. Armitage, a married man, became infatuated with her and gave her considerable money over a period of several years.

"To put it in the vernacular, I am satisfied that he was just a plain sucker, and that she played him for all that he was worth.

"I haven't the slightest bit of respect or sympathy for her, and while I regret that she is permitted to retain these funds, I must conclude that the funds were given to her, and therefore I grant judgment for the defendants."

The court specifically found that the diamond ring and the money furnished by plaintiff for the purchase of the

lease, furniture, and equipment of the Drexel hotel were gifts from plaintiff to defendant, and that Ann Tracy Hogan became and is now the owner of such property; that there was no agreement on the part of defendant to return or repay any of the money; that plaintiff has no right, title, or interest in, or lien on, any of such property; that defendant Israel is under obligation to deliver his written consent to the assignment of the lease; and that defendants Smith have assigned the lease to defendant Hogan. The court further found that plaintiff had failed to prove any fraud on the part of defendant Ann Tracy Hogan, as alleged in the amended complaint, or otherwise.

Conclusions of law and judgment were made and entered in accordance with the findings of fact.

Plaintiff has appealed from the judgment entered.

Error is assigned on the making of findings of fact Nos. 2, 3, 5, and 6, and the making of conclusions of law Nos. 1, 2, 3, and 4; in refusing to enter a decree in favor of appellant; in granting judgment in favor of respondent Hogan; and in refusing to grant appellant's motion for a new trial and for judgment notwithstanding the verdict.

It is stated in appellant's brief that, relying on respondent's promise to marry him, appellant bought her a two thousand dollar diamond engagement ring; that he also, for the same reason, made the down payment of twenty-five hundred dollars on the Drexel hotel lease and furniture; that respondent was to repay him from the earnings of the hotel at the rate of fifty dollars a month; that later, upon respondent's refusal to make the monthly payments of two hundred fifty dollars upon the contract of purchase, appellant paid off the total balance to save her first investment; that respondent never intended to marry appellant at any time; that "she knew she never could make the hurdle and live up to it, on account of her past which she had not disclosed to the appellant."

■ After reading the record, we are unable to conclude that the many articles which appellant gave to respondent, or the money which respondent induced appellant to give to her, including the money for the purchase of the lease

and furnishings of the Drexel hotel, were given or furnished to respondent in consideration of her promise to marry appellant, but, to the contrary, we are convinced that appellant was induced to give respondent the presents which he did, and to furnish her the money for financing the hotel deal, by his desire to have the illegal and immoral association with respondent continued; that he never asked for or expected a return of the ring or money, but the only payment appellant ever expected to receive from respondent was the pleasure he apparently enjoyed and expected to enjoy from such association.

Appellant admitted that no definite time had been set for the marriage ceremony, and, of course, no marriage ceremony could be performed until appellant had procured a divorce from his present wife, and it does not appear that he had taken any steps to initiate divorce proceedings. Appellant admitted that respondent knew he was married.

It may be admitted that appellant gave to respondent many valuable presents and a very considerable amount of money, and it is argued in effect by appellant that he would not have purchased for respondent such a valuable ring, nor would he have advanced to respondent such a large amount of money to make the hotel deal, unless she had, in fact, promised to marry him and had agreed to repay such money. But we know of no yardstick by which to determine the value in money appellant might have, and apparently did, place upon the association and entertainment furnished him by respondent. However, if it be admitted for the sake of argument that respondent did agree to marry appellant, and that the ring was purchased and the money for the hotel deal advanced in consideration of such promise, such agreement would be illegal and void, as appellant was, at that time, and in fact has at all times since been, a married man. We stated in *Jones v. Allen,* 14 Wn. (2d) 111, 127 P. (2d) 265:

"Any attempt, however, to base a right of action upon any promise of marriage made by appellant during the lifetime of Mrs. Allen may be readily dismissed from further consideration. A promise of marriage made by *or to a person who,* to the knowledge of the parties concerned, then

has a spouse living is absolutely void in its inception and cannot give rise to an action for its breach, even though such promise is not to be performed until after the death of, or divorce from, such spouse. Such contracts are in violation of the marital duty and are contrary to morality and public policy. 8 Am. Jur. 848, Breach of Promise of Marriage, § 4; 11 C. J. S. 772, Breach of Marriage Promise, § 2f." (Italics ours.)

▮ If the ring was given to respondent and the purchase of the hotel financed by appellant in consideration of respondent continuing to live illegally with appellant, and of future illicit cohabitation, the agreement would be void.

"A promise in consideration of future illicit cohabitation is given on an immoral consideration and is void whether made by parol or under seal. And the same is true of all agreements which are based on, as a consideration, or which contemplate present or future illicit cohabitation or prostitution." 13 C. J. 460, § 402.

See, also, *Harlow v. Leclair*, 82 N. H. 506, 136 Atl. 128, 50 A.L.R. 973. In the cited case Harlow sought to recover his interest in an automobile which he and defendant owned in common. At the close of plaintiff's case, the court granted defendant's motion for a nonsuit. The opinion states:

"The only sensible interpretation of plaintiff's testimony is that he admitted that an important part of the consideration for the financial help which he gave to the defendant in the purchase of the automobile in question was her agreement to serve as his mistress. If this admission binds the plaintiff, and is to be accepted as conclusively establishing the fact admitted, it follows that the ruling of the trial court was correct."

The motion in the cited case was granted upon the theory that a loan by a man to a woman on consideration that she serve as his mistress cannot be recovered.

While in the instant case appellant did not admit that the consideration for the purchase of the diamond ring and the financing of the Drexel hotel deal was that respondent serve as his mistress when he was in Seattle, we are of the opinion that a fair interpretation of the evidence justifies such a conclusion, and justifies the further conclusion that

respondent never promised to repay the money appellant gave her, and that appellant never expected repayment other than in the manner hereinbefore set out.

In *Lewer v. Cornelius,* 72 Wash. 124, 129 Pac. 911, we announced the following rule, which is so generally recognized as to need no other citation of authority:

"A court will not knowingly aid in the furtherance of an illegal transaction. . . . And if it be found that the differences which it is called upon to adjudicate arise out of an illegal transaction it will leave the parties where it found them, to work out their differences as best they may."

Regardless of the fact that appellant states this action is based on fraud and deceit, we are of the opinion that, under the facts in the case, appellant's claimed cause of action is based upon an illegal and an immoral transaction, and that this court should not lend its aid in furthering such transaction.

We are of the opinion there is ample evidence to support the judgment entered. The court committed no error in denying the motion for new trial or in refusing to grant judgment notwithstanding the decision.

For the reasons herein assigned, the judgment of the trial court is affirmed.

BEALS, C. J., BLAKE, ROBINSON, and CONNELLY, JJ., concur.