TYRANSKI v PIGGINS

1. CONTRACTS—ILLICIT RELATIONSHIP—MONEY—PROPERTY—ENFORCE-
   MENT.

   Although bargains in whole or in part in consideration of an
   illicit relationship are unenforceable, agreements between the
   parties to such a relationship with respect to money or prop-
   erty will be enforced if the agreement is independent of the
   illicit relationship.

2. CONTRACTS—ILLICIT RELATIONSHIP—PROPERTY ACCUMULATIONS—IN-
   DEPENDENT CONSIDERATION.

   Neither party to a meretricious relationship acquires, by reason
   of cohabitation alone, rights in the property accumulations of
   the other during the period of the relationship, but where the
   parties have made an express agreement to accumulate or to
   transfer property following a relationship of some permanence
   and an additional consideration exists in the form of either
   money or of services the courts tend to find an independent
   consideration.

3. CONTRACTS—ILLICIT RELATIONSHIP—PROPERTY ACCUMULATIONS—IN-
   DEPENDENT CONSIDERATION.

   The fact that plaintiff and decedent had lived together for six
   years, although each was married to another person, need not
   defeat an agreement between them where an express agree-
   ment between plaintiff and the deceased for the conveyance of
   a house to plaintiff was established by testimony at the trial
   and there was also evidence that plaintiff had contributed
   $10,000 to the construction of the house and during the time
   they had lived together had acted as the deceased's hostess, had
   cooked his meals, had laundered his clothes, and had cared for
   him in his last illness.

REFERENCES FOR POINTS IN HEADNOTES

[1–4] 17 Am Jur 2d, Contracts §§ 183, 184.
[2, 4] Illicit sexual relations between man and woman affecting right
   of either to recover money paid or property transferred to other,
   120 ALR 475.

4. CONTRACTS—ILLICIT RELATIONSHIP—PROPERTY ACCUMULATIONS—IN-
    DEPENDENT CONSIDERATION.

> Specific performance of an oral agreement to convey a house
> must be upheld in a case thought to be meritorious even
> though a meretricious relationship had existed between the
> parties to the agreement because where a meretricious relation-
> ship has already been entered upon, to penalize one of the
> parties by striking down their otherwise lawful promises will
> not undo the relationship nor is it likely to discourage others
> from entering upon such relationships and equity does not
> demand that its suitors shall have led blameless lives.

Appeal from Wayne, Neal E. Fitzgerald, J. Sub-
mitted Division 1 April 7, 1972, at Detroit. (Docket
No. 11388.) Decided February 20, 1973. Leave to
appeal denied, 389 Mich 793.

Complaint by Helen Tyranski against Frederick
F. Piggins, ancillary administrator with will an-
nexed of the estate of Alfred P. Lattavo, for spe-
cific performance of an oral agreement with dece-
dent to convey a house to plaintiff. Judgment for
plaintiff. Defendant appeals. Affirmed.

*Charest, Clancy & Katulski,* for plaintiff.

*Piggins, Grigsby & Erickson,* for defendant.

Before: LEVIN, P. J., and BRONSON and VAN
VALKENBURG,* JJ.

LEVIN, P. J. The plaintiff, Mrs. Helen Tyranski,
commenced this action in January, 1970, claiming
that she was entitled to a house located on Blue
Skies Avenue, Livonia, Michigan, which was held
in the name of Alfred P. Lattavo. Mr. Lattavo had
died in October, 1969.

At the conclusion of the trial, the judge, who sat
without a jury, found that Mrs. Tyranski was
entitled to the house and its furnishings. A judg-

---

* Former circuit judge, sitting on the Court of Appeals by assign-
ment pursuant to Const 1963, art 6, § 23 as amended in 1968.

ment was entered for specific performance of an oral agreement the judge found Lattavo had made with Mrs. Tyranski to convey the house to her.

The defendant, the ancillary administrator of Lattavo's estate, does not, on appeal, dispute the claimed oral agreement. He contends that the judge should have refused to enforce the agreement because of the meretricious relationship of the parties. We affirm.

Lattavo, who traveled frequently in connection with his trucking business, met Mrs. Tyranski in 1963, while she was working as a cocktail waitress. They were attracted to one another and shortly thereafter began living together in Mrs. Tyranski's rented Detroit home, and later in an apartment. After they had been living together for nearly four years, Lattavo had the Blue Skies house built. There is evidence that tends to show that $10,000 of the required funds was contributed by Mrs. Tyranski. Mrs. Tyranski decorated the house and selected the furniture. They lived together in the Blue Skies home from 1967 until Lattavo's death.

Lattavo had married Rosella Lattavo in 1941. He made trips to their home in Canton throughout the period of his relationship with Mrs. Tyranski, though by 1967 he spent only a few days a month in Canton. The rest of the time he spent in Livonia.

Mrs. Tyranski is a married woman and the mother of two children. She has been separated from her husband for many years, but never secured a divorce. Lattavo acted as a father to her children, and gave away her daughter, Laura, in marriage. While Lattavo was in Michigan, he and Mrs. Tyranski lived together as man and wife, and at least one mutual friend testified that she knew Mrs. Tyranski as "Mrs. Lattavo".

Rosella Lattavo testified that she did not learn about Mrs. Tyranski or the Blue Skies house until she went to an attorney to file for a divorce and had her husband investigated in August, 1969.

The issue is whether Mrs. Tyranski's claim under the agreement is defeated by the meretricious relationship.

While the parties illicitly cohabited over a period of years, that does not render all agreements between them illegal. Professor Corbin and the drafters of the Restatement of Contracts both write that while bargains in whole or in part in consideration of an illicit relationship are unenforceable, agreements between parties to such a relationship with respect to money or property will be enforced if the agreement is independent of the illicit relationship.[1]

Neither these authorities nor the large body of case law in other jurisdictions—there is no Michigan authority dealing with this precise issue—articulate a guideline for determining when the consideration will be regarded as "independent", and when it is so coupled with the meretricious acts that the agreement will not be enforced. A pattern does, however, emerge upon reading the cases.

Neither party to a meretricious relationship acquires, by reason of cohabitation alone, rights in the property accumulations of the other during the period of the relationship.[2] But where there is an express agreement to accumulate or transfer

---

[1] 6A Corbin, Contracts, § 1476, p 622; 2 Restatement Contracts, §§ 589, 597, pp 1098, 1108.

[2] *Cargill v Hancock,* 92 Idaho 460, 465; 444 P2d 421, 426 (1968); *Humphries v Riveland,* 67 Wash 2d 376, 389; 407 P2d 967, 973 (1965); *Stevens v Anderson,* 75 Ariz 331, 336; 256 P2d 712, 715 (1953); *Smith v Smith,* 255 Wis 96, 99; 38 NW2d 12, 14 (1949); *Vallera v Vallera,* 21 Cal 2d 681, 684–685; 134 P2d 761, 763 (1943).

property following a relationship of some permanence and an additional consideration in the form of either money or of services, the courts tend to find an independent consideration.

Thus, a plaintiff who can show an actual contribution of money, pursuant to an agreement to pool assets and share accumulations, will usually prevail.[3] Services, such as cooking meals, laundering clothes, "caring" for the decedent through sickness, have been found to be adequate and independent considerations in cases where there was an express agreement.[4]

An express agreement to convey the Blue Skies house was established by testimony at the trial. There was also evidence that Mrs. Tyranski had "changed the tenor of her life" in performance of the agreement so as to make reasonable the inference that there was such an agreement. See *In re Cramer's Estate,* 296 Mich 44, 49 (1941).

Mrs. Tyranski cleaned the house, did the marketing, cooked the food, did Mr. Lattavo's personal laundry, and acted as his hostess. She cared for him when he was sick, especially during the last year and a half of his life when his condition required greater attention and care. There was also the evidence of the $10,000 claimed to have been contributed by Mrs. Tyranski to Lattavo in April or May of 1967.[5]

---

[3] *Zytka v Dmochowski,* 302 Mass 63, 65; 18 NE2d 332, 334 (1938). *See, also, Smith v Smith,* 108 So 2d 761, 763 (Fla, 1959). Even in the absence of an express agreement, California cases have held that a woman is entitled to share in property jointly accumulated in the proportion that her funds contributed toward its acquisition. *Keene v Keene,* 57 Cal 2d 657, 662; 21 Cal Rptr 593, 596; 371 P2d 329, 332 (1962); *Vallera v Vallera, supra,* p 763; *Garcia v Venegas,* 106 Cal App 2d 364, 368; 235 P2d 89, 92 (1951).

[4] *Wurche v Stenzel,* 270 Cal App 2d 499, 504–505; 75 Cal Rptr 856, 859–860 (1969); *Merchants National Bank of Mobile v Cotnam,* 250 Ala 316, 325–326; 34 So 2d 122, 129–130 (1948); *Lynch v Rogers,* 177 Md 478, 489; 10 A2d 619, 624 (1940); *McMillan v Massie's Executor,* 233 Ky 808, 814; 27 SW2d 416, 420 (1929).

[5] The money could be traced to the house on Blue Skies only by

It has been said that "equity does not demand
that its suitors shall have led blameless lives".
*Loughran v Loughran,* 292 US 216, 229; 54 S Ct
684, 689; 78 L Ed 1219, 1227 (1934). The Michigan
case law is in accord. In *Burns v Stevens,* 236
Mich 447, 452–453 (1926), the plaintiff (the man)
and the defendant (the woman) lived together for
three years. They made a $1,000 down payment on
a cottage. They signed a land contract "jointly".
After the man tired of the woman, he brought suit
claiming the cottage was his property and that her
name was put on the contract to secure repayment
to her of $400 she had advanced. He sought to
have her interest in the contract declared to be a
mortgage. In upholding the trial court's determi-
nation in his favor, the Michigan Supreme Court
said:

> "[T]he rule that if the parties to a suit are *in pari
> delicto* a court of equity will leave them where they
> have placed themselves should not be here applied.
> * * * The question to be determined in this case * * *
> is whether the party acquired an interest in the prop-
> erty or a security for the money advanced. *The manner
> in which they were then living is immaterial to the
> issue* except in its bearing upon the weight to be given
> to their testimony. The doors of courts are not closed to
> people who lead immoral lives when contracts between
> them untainted with illegality or fraud are involved."
> (Emphasis supplied.)

There are no other Michigan cases concerning
the kind of factual situation with which we are
now confronted. The defendant relies on Michigan
precedent holding that a contract founded on an
act prohibited by a penal statute is unenforceable

inference. Mrs. Tyranski did not testify, possibly because of the "dead
man's statute". Mrs. Tyranski's mother testified that she gave inheri-
tance money to Mrs. Tyranski for the house. Mrs. Tyranski's daugh-
ter testified that Mr. Lattavo "said he would consent to taking [the
$10,000] as part payment for the house".

*(Silver v A O C Corp,* 31 Mich App 147 [1971])[6] and asserts that the agreement relied on by Mrs. Tyranski is founded on acts violative of MCLA 750.335; MSA 28.567, making it a crime to engage in lewd and lascivious cohabitation.

In *Silver,* the plaintiff sought to recover for electrical work he performed at a time when he was not a duly licensed electrical contractor. Enforcement of the bargain would have subverted the legislative purpose.[7]

Silver could not recover except on the strength of a contract to perform work which he was not licensed to perform. Contrariwise, Mrs. Tyranski was able to establish the contract to transfer the Blue Skies house to her without reference to her sexual relationship with Mr. Lattavo.[8]

---

[6] Similarly, see *In re Reidy's Estate,* 164 Mich 167, 173 (1910); *Cashin v Pliter,* 168 Mich 386, 389 (1912); *Turner v Schmidt Brewing Co,* 278 Mich 464, 470 (1936).

[7] Compare *Lake States Engineering Corp v Lawrence Seaway Corp,* 15 Mich App 637, 645–646 (1969); *Adams v Edward M. Burke Homes, Inc,* 14 Mich App 578, 593 (1968) (Levin, J, concurring).

[8] We have examined the cases decided in other jurisdictions relied on by the defendant in his brief and have found them to be distinguishable.

In *Wellmaker v Roberts,* 213 Ga 740; 101 SE2d 712 (1958), the Court found that the agreement between the woman (plaintiff) and the man (defendant) to engage in illicit sexual relations "formed a part of the contract relied upon by her as the basis for the recovery."

In *Heaps v Toy,* 54 Cal App 2d 178; 128 P2d 813 (1942), the woman agreed to refrain from marrying other men so that she could maintain an illicit relationship with the defendant. Under the Civil Code of California, such an agreement is declared void. The Court relied on that statutory provision, and also found that the consideration for the agreement was "contrary to good morals" and hence unlawful under another provision of the Civil Code.

*Armitage v Hogan,* 25 Wash 2d 672; 171 P2d 830 (1946), was an action by the man to recover from a seller of a hotel money that the plaintiff had paid in partial payment of the purchase price of the hotel which the plaintiff was buying for his courtesan. While the plaintiff claimed a contract to marry, the woman denied it saying that all that was involved was an illicit relationship. The Court in this case concluded as a factual matter that the only contract was a contract for illicit services and, therefore, the contract would not be enforced.

In *Grant v Butt,* 198 SC 298; 17 SE2d 689 (1941), the plaintiff

Where a meretricious relationship has already been entered upon, to penalize one of the parties by striking down their otherwise lawful promises, will not undo the relationship, nor is it likely to discourage others from entering upon such relationships. It appears on examination of the cases that the courts have, on various theories, allotted to the woman a share of the property in cases thought to be meritorious.[9] We are persuaded, as was the trial judge, that this is such a case.

Affirmed. Costs to plaintiff.

All concurred.

---

woman was part Indian and part black, and the man was white. The contract, said the Court, struck at the legitimate propagation of the race to which one belongs, and its enforcement would circumvent the constitution and statutes of the State of South Carolina relating to the intermarriage of the races.

In *Groves v Whittenburg,* 120 SW2d 870 (Tex Civ App, 1938), the only evidence of an express agreement indicated in the opinion was the word of the woman promisee who claimed she was promised $100,000 for continuing a sexual relationship. While the woman also claimed that she rendered services, it does not appear that "services" other than sexual services were rendered.

In *Angresani v Tozzi,* 217 App Div 642, 643; 216 NYS 161, 163 (1926), the Court concluded, on the basis of the amount of wages the plaintiff earned in lawful employment and the amount she claimed for services rendered to the defendant, that the "direct object [of the agreement was] the promotion of illicit sexual intercourse."

[9] *Williams v Bullington,* 32 So 2d 273, 275 (Fla, 1947); *Warner v Warner,* 76 Idaho 399, 407; 283 P2d 931, 935 (1955); *Karoley v Reid,* 223 Ark 737, 743; 269 SW2d 322, 326 (1954); *Bridges v Bridges,* 125 Cal App 2d 359, 363; 270 P2d 69, 71 (1954).

*Cf. Sheneman v Sheneman,* 30 Mich App 1, 28 (1971); *Stevenson v Detroit,* 42 Mich App 294, 299 (1972).