396 S.E.2d 430

**Martha Louise GOODE**

v.

**Carl Edward GOODE.**

**No. 19439.**

Supreme Court of Appeals of West Virginia.

July 20, 1990.

Daniel F. Hedges, Hamlin, William W. Carter, Charleston, for Martha L. Goode.

Carl Edward Goode, Hamlin, for Carl E. Goode.

McHUGH, Justice:

This case is before the Court upon two certified questions from the Circuit Court of Lincoln County. The plaintiff is Martha Louise Goode. The defendant is Carl Edward Goode.[1]

I

The plaintiff filed a divorce action in the Circuit Court of Lincoln County based upon irreconcilable differences and mental and physical cruelty.[2] However, the plaintiff and defendant's "marriage" was not the result of a formal ceremony, nor is there a marriage license to substantiate the plaintiff's claim that a marriage exists.

Rather, the plaintiff alleges that her marriage to the defendant is based upon the following, as found by the circuit court: (1) the plaintiff and defendant orally agreed to be "married" for life, on June 24, 1961; (2) the parties agreed to pool their resources, to share equally in marital property, and to provide lifelong mutual financial and emotional support to each other; (3) the parties have lived together for 28 years, from June, 1961, to July, 1989; (4) the parties held themselves out to be married for 28 years, and were regarded by others in the community to be husband and wife; (5) the parties had four children to-

---

1. The plaintiff has submitted a memorandum of law exhaustively briefing the issues in this case. The defendant, however, according to counsel for the plaintiff, does not object to the certification of the questions involved in this case, and, therefore, has made no submission in this case.

2. *W.Va.Code,* 48–2–4(a)(10) [1981] provides grounds for a divorce based upon "irreconcilable differences[.]" *W.Va.Code,* 48–2–4(a)(4) [1981] provides grounds for a divorce based upon "cruel or inhuman treatment by either party against the other[.]"

gether; and (6) the parties purchased real property, jointly, as a married couple, on three separate occasions. Each separate deed makes reference to "Carl E. Goode and Martha L. Goode, Husband and Wife."

On July 18, 1989, the defendant left the parties' most recent residence.

The plaintiff is 47 years old, and the defendant is 61 years old. The plaintiff contends that she should be entitled to an "equitable distribution" of the property acquired over the 28 years of her relationship with the defendant. Furthermore, the plaintiff would be entitled to Social Security benefits for which the defendant would be eligible, in the event their "marriage" is legally recognized. *See* 42 *U.S.C.* § 416(h)(1)(A) (1988).[3]

The circuit court opined that questions of law pertaining to common-law marriage must be answered, and, therefore, certified the following two questions to this Court:

> 1. Whether or not a common law marriage can arise by operation of law in the State of West Virginia, and if so, what are the elements of a valid common law marriage?
>
> 2. If a common law marriage is not recognized by West Virginia law, or if recognized and not found in fact to exist between the parties by the trial court in this case, whether a Court may award support and/or order equitable distribution of property between a man and a woman who have lived together as husband and wife but lack the ceremonial and licensing formalities of a legal marriage?

The circuit court further opined that both certified questions should be answered in the negative.

## II

■ We begin by addressing the first of the questions certified to us by the circuit court, that is, whether or not a common-law marriage can arise by operation of law in this state.

In *Beverlin v. Beverlin*, 29 W.Va. 732, 3 S.E. 36 (1887), this Court considered the issue of common-law marriage, and, in syllabus point 1 of that case, held that "[c]ommon-law marriages, when contracted in this State, are not recognized by our courts as valid."

In *Beverlin*, at issue was *W.Va.Code* ch. 63, § 6 [1868], which provided:

> Every marriage in this state shall be under a license, and solemnized in the manner herein provided; *but* no marriage solemnized by any person professing to be authorized to solemnize the same shall be deemed or adjudged to be void, nor shall the validity thereof be in any way affected, on account of any want of authority in such person, if the marriage be in all other respects lawful, and be consummated with a full belief on the part of the persons so married, or either of them, that they have been lawfully joined in marriage, nor shall any marriage celebrated within this State, between the 17th day of April, 1861, and the 1st day of January, 1866, be void by reason of the same having been solemnized without such license.

(emphasis supplied)

The statute at issue in *Beverlin* has since been amended, and is now codified as *W.Va.Code*, 48–1–5 [1969]. Simply stated, that statute provides: "Every marriage in this State shall be solemnized under a license as provided in this article."[4]

The *Beverlin* Court interpreted *W.Va. Code* ch. 63, § 6 as *requiring* a marriage license, holding that that statute's language was mandatory as opposed to directory. Placing great weight upon the qualifying provisions of *W.Va.Code* ch. 63, § 6 [1868], the Court pointed out:

> The statute, under consideration, in express words declares, that 'every marriage in this State shall be under a li-

---

**3.** 42 *U.S.C.* § 416(h)(1)(A) (1988) is discussed in more detail in section II of this opinion.

**4.** *W.Va.Code,* 48–1–6 [1986] sets forth provisions for the application of a marriage license and requirements for the issuance thereof. *W.Va. Code,* 48–1–9 [1961] sets forth the form which a marriage license shall substantially follow.

cense, and be solemnized in the manner herein provided.' It is possible that these words, standing alone, should, under the general rule just stated, be interpreted as merely directory. But the statute does not stop here. It qualifies these words by provisions which would be wholly useless and unnecessary, if it were intended and should be held that the preceding provisions are simply directory. It is declared that certain marriages shall not 'be deemed or adjudged void,' because the person solemnizing them did not in fact have authority to do so. It also declares that certain other marriages shall not be void, because they were solemnized without a license.... It is apparent that the legislature must have interpreted the statute as making the excepted marriages null and void without the excepting clauses, for otherwise the exceptions would be useless and would not have been made. The introduction of the exceptions is necessarily exclusive of all other independent, extrinsic exceptions.

29 W.Va. at 738–39, 3 S.E. at 39–40.

The plaintiff contends that because the legislature has since removed the qualifying provisions found in the previous version of *W.Va.Code*, 48–1–5, then the licensing statute is now directory, and not mandatory. We do not agree with this contention.

The qualifying provisions found in the previous version of *W.Va.Code*, 48–1–5 are now contained in *W.Va.Code*, 48–1–15 [1931]. Consequently, it is obvious that the legislature intended to retain these provisions as a part of this state's marriage statutes.

The plaintiff also points out that "the great weight of authority holds that marriage license statutes are merely directory [, and not mandatory]." *DePotty v. DePotty*, 226 Ark. 881, 883, 295 S.W.2d 330, 331 (1956). *See Meister v. Moore*, 96 U.S. 76, 80, 24 L.Ed. 826, 827 (1878); *Carabetta v. Carabetta*, 182 Conn. 344, 350, 438 A.2d 109, 112 (1980); *In re Parsons*, 44 Del. 406, 412–13, 59 A.2d 709, 712 (Super.Ct.1948); annotation, *Validity of Solemnized Marriage as Affected by Absence of License*

*Required by Statute*, 61 A.L.R.2d 847 (1958).

"In accordance with this [general] rule it has been held that a valid common-law marriage may be entered into without first obtaining a license pursuant to statute." 55 C.J.S. *Marriage* § 24, at 857 (1948) (and cases cited therein).

This general rule, however, does not support the claim of the plaintiff in this case, that the validity of a common-law marriage should be recognized simply because the legislature has removed the qualifying provisions from *W.Va.Code*, 48–1–5. Two reasons stand in the way of the plaintiff's contention in this regard.

First, the general rule that a marriage license statute is merely directory does not *per se* give rise to the recognition of the validity of a common-law marriage. Rather, this concept relates to "whether a valid marriage results when there is a *ceremony* without a license, or without a valid license[.]" 1 H. Clark, *The Law of Domestic Relations in the United States* § 2.3, at 94 (2d ed. 1987) (emphasis supplied). *See also DePotty, Carabetta,* and *Parsons,* wherein there was a failure to obtain a license or the license obtained was defective, but there was a marriage *ceremony* nonetheless. In this case, there was no marriage ceremony.

Second, and more importantly as it pertains to this jurisdiction, in *Kisla v. Kisla*, 124 W.Va. 220, 19 S.E.2d 609 (1942), this Court expressly held that *W.Va.Code*, 48–1–5 is mandatory. *Id.* 124 W.Va. at 223, 19 S.E.2d at 610.

Alternatively, the plaintiff urges us to reexamine this Court's decisions in *Beverlin* and *Kisla*, maintaining that contemporary disapproval of common-law marriage is rooted not in the mores of today, but in outmoded nineteenth century morality which condemned nonmarital cohabitation.

Specifically, the plaintiff cites recent decisions of this Court as examples of how we have abandoned "outdated notions" with respect to the household setting. *See, e.g., David M. v. Margaret M.*, 182 W.Va. 57, 385 S.E.2d 912 (1989) (restating prin-

ciple that either parent can be "primary caretaker" of child(ren) and setting forth guidelines therefor); *LaRue v. LaRue*, 172 W.Va. 158, 304 S.E.2d 312 (1983) (recognizing homemaker services in equitable distribution determination).

Our research reveals that thirty-seven states do not recognize the validity of common-law marriages, while the remaining thirteen states and the District of Columbia do recognize the validity of such marriages.[5] Of West Virginia's five contiguous states, three do not recognize the validity of common-law marriages. *See Ky.Rev.Stat.Ann.* § 402.020(1)(c) (Michie 1988); *Md. Family Law Code Ann.* § 2–401 (1984); *Va.Code Ann.* § 20–13 (1950). The other two contiguous states are among the fourteen jurisdictions that do so recognize. *See* syl., *Umbenhower v. Labus*, 85 Ohio St. 238, 97 N.E. 832 (1912); *Pa.Stat.Ann.* tit. 48, § 1–23 (Purdon 1953).

The plaintiff contends that nonrecognition of the validity of her common-law marriage gives rise to financial hardship. Particularly, the plaintiff maintains that a favorable decision on the question of common-law marriage will allow her to receive spousal Social Security benefits and will entitle her to an equitable distribution of property which has been acquired since her cohabitation with the defendant.

42 *U.S.C.* § 416(h)(1)(A) (1988) sets forth, for purposes of receiving spousal Social Security benefits, that:

> (1)(A) An applicant is the wife ... of a fully or currently insured individual ...

if the courts of the State in which such insured individual ... would find that such applicant and such insured individual were validly married.... If such courts would not find that such applicant and such insured individual were validly married at such time, such applicant shall, nevertheless be deemed to be the wife ... if such applicant would, under the laws applied by such courts in determining the devolution of intestate personal property, have the same status with respect to the taking of such property as a wife ... of such insured individual.

Our law of descent and distribution contains no provision for an individual to be "deemed" a spouse for purposes of devolution of intestate personal property so as to make such individual eligible for Social Security benefits pursuant to 42 *U.S.C.* § 416(h)(1)(A) (1988). In *Pace v. Celebrezze*, 243 F.Supp. 317, 319–20 (S.D.W.Va. 1965), it was held that Social Security benefits were not payable to the plaintiff because the plaintiff and the insured individual were not validly married.[6]

Similarly, the plaintiff claims that by not recognizing the validity of her common-law marriage to the defendant, she will not be entitled to an equitable distribution of property pursuant to *W.V.Code*, 48–2–32 [1984]. This is unjust, the plaintiff maintains, because for 28 years, she performed traditional homemaker services for the defendant and their children, such as: preparing meals; bathing and dressing the children;

---

5. For a collection of statutory provisions and court decisions that decline to recognize common-law marriages, see 1 H. Clark, *The Law of Domestic Relations in the United States* § 2.4, at 101–02 n. 9 (2d ed. 1987). For a collection of provisions and decisions recognizing such marriages, see *id.*, at 103 n. 11.

6. In *Pace*, the court also denied eligibility for Social Security benefits to the plaintiff's children. Among other things, at issue was *W.Va. Code*, 42–1–7 [1931], which provides: "The issue of marriages deemed null in law, or dissolved by a court, shall nevertheless be legitimate." Because the plaintiff and the insured individual in that case were not engaged in a "marriage[ ] deemed null in law," the court held that the children did not qualify for benefits pursuant to

*W.Va.Code*, 42–1–7 [1931]. While this result seems harsh, the court in *Pace* noted this Court's decision in *Kester v. Kester*, 106 W.Va. 615, 146 S.E. 625 (1929). In syllabus point 1 of *Kester*, this Court held:

> A common-law marriage contracted in this state is not a valid marriage and is deemed null in law; nevertheless, the children of such marriage are legitimate under [*W.Va.Code*, 42–1–7], which provides that: "The issue of marriages deemed null in law, or dissolved by a court, shall nevertheless be legitimate."

Therefore, the children of the parties in this case would be legitimate under *W.Va.Code*, 42–1–7 [1931], provided there is evidence to support the contention that a common-law marriage has been contracted, and despite the validity of such a marriage not being recognized.

purchasing food, clothes, and other home supplies; coordinating medical care for the children; providing the children their religious, cultural, and social training; assisting the children with school work; maintaining the family budget; and caring for the defendant when he was sick or disabled. The plaintiff also asserts that although the defendant has amassed considerable assets during their relationship, she (the plaintiff) neither owns property nor possesses savings in her own name. Furthermore, the plaintiff points out that she has foregone educational and occupational opportunities while raising the children, caring for the defendant, and maintaining the household.

While we are not unaware of the financial difficulties that may be experienced by persons in situations similar to that of the plaintiff, we are not willing to abandon the statutory requirements of marriage in this state. Obviously, the citizens of this state, by way of the legislative process, have expressed in *W.Va.Code*, 48–1–5 [1969] a preference for the solemnization of marriage. Due to the presence of this statutory provision, we will not impose an alternative view. Rather, that task is better left to the legislature, should it so choose to abolish the solemnization requirements of *W.Va.Code*, 48–1–5 [1969].[7]

It is a well established "view that if the law were to be changed to permit a valid marriage to be effectuated 'by the mere private contract of the parties, without go-ing before any one as a magistrate or minister,' that should properly be 'a matter for *legislative,* and *not judicial* [,] consideration.'" *Pierce v. Secretary of United States Department of Health, Education & Welfare,* 254 A.2d 46, 48 (Me.1969) (quoting *Commonwealth v. Munson,* 127 Mass. 459, 470 (1879)) (emphasis supplied).

It has been observed that

[t]he laws prescribing marriage formalities are ostensibly the expression of intent that certain couples be accorded approved status in the society with corresponding rights and duties. The undertaking of those formalities evidences the couple's intention to be governed by that socially approved status in their relationship to each other and to the society.

Kandoian, *Cohabitation, Common Law Marriage, and the Possibility of a Shared Moral Life,* 75 Geo. L.J. 1829, 1839 (1987).

Accordingly, we hold that pursuant to the statutory requirements of *W.Va.Code,* 48–1–5 [1969], every marriage in this state must be solemnized under a license. Therefore, the validity of a common-law marriage is not recognized.[8]

### III

We now turn to the second and more important question certified to us by the circuit court, that is, whether an equitable division of property may be awarded to a man or woman who, prior to the termination of their relationship with each other, were unmarried cohabitants.[9]

**7.** As an alternative to rejecting the *Beverlin–Kisla* approach, the plaintiff suggests that this Court follow its own approach in syllabus point 2 of *Wheeling Dollar Savings & Trust Co. v. Singer,* 162 W.Va. 502, 250 S.E.2d 369 (1978), wherein we incorporated into law the doctrine of "equitable adoption," thus, holding that the formal adoption procedures provided by former *W.Va.Code,* 48–4–1 to 48–4–9, as amended, were not "the exclusive method by which a person may be accorded the protections of adoptive status[.]" *Id.* 162 W.Va. at 508, 250 S.E.2d at 373.

The plaintiff, however, has not cited any precedents where an "equitable adoption" theory was utilized to support a theory of "equitable marriage." In light of the mandatory language of *W.Va.Code,* 48–1–5 [1969], as set forth in this opinion, we are not willing to extend our theory of "equitable adoption" to recognition of the validity of common-law marriage.

**8.** Our decision in this case does nothing to alter our recognition of common-law marriages which are contracted in other states and recognized as valid therein. "The courts of this state will recognize as valid and will accord legal effect to a common-law marriage created or consummated in another state if common-law marriages are recognized as valid in that state." *State v. Bragg,* 152 W.Va. 372, 375–76, 163 S.E.2d 685, 687–88 (1968).

**9.** The second question certified to us by the circuit court made reference to an "equitable distribution of property," and not to an "equitable division of property." However, "upon receiving certified questions we retain some flexibility in determining how and to what extent they will be answered." *City of Fairmont v. Retail, Wholesale, & Department Store Union,* 166 W.Va. 1, 3–4, 283 S.E.2d 589, 590–91 (1980).

The criticism leveled at the majority of states which do not recognize the validity of common-law marriage has been heavy. One commentator has observed:

> As for debasing conventional marriage, there seems little risk that common law marriage will have this effect, so long as the traditional evidence of the relationship is required. When that is done, there is no ostensible difference between common law marriage and ceremonial marriage in the lives of the spouses. In fact we debase the institution of marriage when we place conclusive significance on the occurrence of a ceremony. *When a woman has performed the obligations of a wife for thirty-five years and then is brutally deprived of all the financial benefits of marriage on the sole ground that the relationship was not signalized by some sort of a ceremony, this debases marriage.* It is far better in such cases to hold that the parties were married.

1 H. Clark, *The Law of Domestic Relations in the United States* § 2.4, at 121–22 (2d ed. 1987) (emphasis supplied) (footnote omitted).

Consequently, "[t]he rapid increase during the past two decades in the number of unmarried couples living together in social, economic and sexual relationships resembling marriage has been accompanied by greater judicial recognition and protection of contract rights and obligations arising out of cohabitation." *Family Law and Practice* § 65.01, at 65–2 (A. Rutkin gen. ed. 1989).

In the highly celebrated case of *Marvin v. Marvin,* 18 Cal.3d 660, 557 P.2d 106, 134 Cal.Rptr. 815 (1976) (en banc), the Supreme Court of California held that although the provisions of that state's Family Law Act do not govern the distribution of property acquired by unmarried cohabitants, other relief may be available. This other relief, the *Marvin* court held, may be in the form of an express contract, or, in the absence thereof, on the basis of an implied contract, a partnership, or a tacit understanding between the unmarried cohabitants. With regard to an express contract, however, the court held that such contract may not be based upon consideration of meretricious services.[10] The California court summarized its holding thusly:

> In summary, we base our opinion on the principle that adults who voluntarily live together and engage in sexual relations are nonetheless as competent as any other persons to contract respecting their earnings and property rights. Of course, they cannot lawfully contract to pay for the performance of sexual services, for such a contract is, in essence, an agreement for prostitution and unlawful for that reason. But they may agree to pool their earnings and to hold all property acquired during the relationship in accord with the law governing community property; conversely they may agree that each partner's earnings and the property acquired from those earnings remains the separate property of the earning partner. So long as the agreement does not rest upon illicit meretricious consideration, the parties may order their economic affairs as they choose, and no policy precludes the courts from enforcing such agreements.

18 Cal.3d at 674, 557 P.2d at 116, 134 Cal.Rptr. at 825.

On the other hand, in another widely publicized case, Illinois' highest court rejected the *Marvin* approach. In *Hewitt v. Hewitt,* 77 Ill.2d 49, 31 Ill.Dec. 827, 394 N.E.2d 1204 (1979), the Supreme Court of Illinois, by indicating its concern with the societal effect and not the individual effect of nonmarital cohabitation, rejected the notion that unmarried couples are entitled to property rights based upon their cohabiting

---

**10.** Traditionally, there was a dearth of judicial sympathy for nonmarital cohabitation due to the meretricious nature of such relationships. American courts were virtually unanimous in rejecting the claims a party to a 'meretricious relationship' might bring for a share of property accumulated during cohabitation or for support after the cohabitation. The common standard was that any agreement which was intertwined with sexual services was void on public policy grounds.
*Family Law and Practice* § 65.01[2], at 65–4 (A. Rutkin gen. ed. 1989).

relationship. "Of substantially greater importance than the rights of the immediate parties is the impact of such recognition upon our society and the institution of marriage." *Id.* at 58, 31 Ill.Dec. at 830, 394 N.E.2d at 1207.

The Illinois court viewed the issue as "whether it is appropriate for this court to grant a legal status to a private arrangement substituting for the institution of marriage sanctioned by the State." *Id.* at 61, 31 Ill.Dec. at 832, 394 N.E.2d at 1209.[11]

We do not view the issue as being this cut and dried. The rigidity of the approach taken in *Hewitt,* as it relates to competing interests, was well-stated by the Supreme Court of Nevada, in addressing this very issue. "We recognize that the state has a strong public policy interest in encouraging legal marriage. We do not, however, believe that policy is well served by allowing one participant in a meretricious relationship to abscond with the bulk of the couple's acquisitions." *Hay v. Hay,* 100 Nev. 196, 199, 678 P.2d 672, 674 (1984).

Like the Nevada Supreme Court in *Hay,* several other courts have embraced implied contracts for a division of property based upon cohabitation. *See, e.g., Cook v. Cook,* 142 Ariz. 573, 691 P.2d 664 (1984) (en banc); *Glasgo v. Glasgo,* 410 N.E.2d 1325 (Ind.Ct. App.1980); *Beal v. Beal,* 282 Or. 115, 577 P.2d 507 (1978); *In re Estate of Steffes,* 95 Wis.2d 490, 290 N.W.2d 697 (1980).

Similarly, some courts have granted relief by applying general equity theories in the division of property acquired through the joint efforts of unmarried cohabitants. *See, e.g., Eaton v. Johnston,* 235 Kan. 323,

681 P.2d 606 (1984); *Pickens v. Pickens,* 490 So.2d 872 (Miss.1986).[12]

This Court spoke to the presence of equitable principles in the marital context in *LaRue v. LaRue,* 172 W.Va. 158, 304 S.E.2d 312 (1983). There, in adopting the doctrine of equitable distribution, we stated that such doctrine "rests upon concepts of unjust enrichment[.]" *Id.* 172 W.Va. at 167, 304 S.E.2d at 320. Quoting from *Patterson v. Patterson,* 167 W.Va. 1, 12–13, 277 S.E.2d 709, 716 (1981), *overruled on another point,* syl. pt. 6, *LaRue,* we reiterated the following principles:

'It is apparent from the law of trusts that the purpose of a constructive trust is to redress unjust enrichment resulting from an equitable wrong. The extent of the property subjected to the trust should be equal to the extent of unjust enrichment. That is, a wife should be entitled to a trust in property to the extent that the husband is unjustly enriched by her contribution.'

*LaRue,* 172 W.Va. at 167, 304 S.E.2d at 320.

We further stated in *LaRue* our belief that these equitable principles

are compatible with the doctrine of equitable distribution, which permits a spouse, who has made a material economic contribution toward the acquisition of property which is titled in the name of or under the control of the other spouse, to claim an equitable interest in such property in a proceeding seeking a divorce.

*Id.*

Of course, *LaRue* established the doctrine of equitable distribution (in this state)

---

**11.** In *Spafford v. Coats,* 118 Ill.App.3d 566, 74 Ill.Dec. 211, 455 N.E.2d 241 (1983), an Illinois appeals court refused to apply the holding in *Hewitt,* thus, allowing a plaintiff involved in a nonmarital cohabitation to claim property through a constructive trust. There, the court distinguished *Hewitt* based upon grounds that in *Spafford,* "the claims of the plaintiff are substantially independent of the nonmarital relationship of the parties and are not based on rights arising from their cohabitation." *Id.* at 572, 74 Ill.Dec. at 215, 455 N.E.2d at 245.

At least one state has responded to *Marvin* through legislation. This legislation requires a

contract between an unmarried cohabiting man and woman to be in writing, if sexual relations between the parties to such a relationship are contemplated. *Minn.Stat.Ann.* §§ 513.075 & 513.076 (West 1980). *See In re Estate of Eriksen,* 337 N.W.2d 671, 673 (Minn.1983).

**12.** For a more detailed collection of cases where express contracts, implied contracts, and equitable principles have been recognized in this context, see *Family Law and Practice* § 65.01[3], at 65–5 to 65–6 n. 11, n. 12 & n. 13 (A. Rutkin gen. ed. 1989).

as it pertains to a *valid marriage* ending in divorce.[13]

In this case, we are asked to apply similar equitable principles, as well as principles of contract to a situation where a man and woman are not married, but have lived together and have held themselves out to be husband and wife.

The plaintiff's claim is based upon her allegations that from the age of 19 to the age of 47, she provided a wide range of homemaker services that materially contributed to the economic well-being of the defendant and their children. In so providing, the plaintiff alleges that the defendant was able to pursue full-time employment, thus rendering him better able to amass his own assets. Furthermore, the plaintiff points out that she has foregone occupational opportunities of her own in order to provide homemaker services.

This Court, like the Nevada court in *Hay,* recognizes that the state has a strong policy interest in encouraging legally valid marriages. *See supra* section II. However, we, like the Nevada court, also recognize that this policy must not defeat a person's equitable interests, nor a person's rights based upon a valid agreement, expressed or implied.[14]

Assuming, without deciding, that the plaintiff proves that she provided homemaker services to the extent that she alleges, we believe that it would be inequitable to not recognize her role in the acquisition of property with the defendant during the period of their cohabitation.

We also recognize the possibility that a man or woman engaged in this type of cohabiting relationship may be validly married to another person during the period of cohabitation. Therefore, it must be understood that our holding in this case does nothing to affect the property rights of the spouse and the support rights of the children of such valid marriage.

Accordingly, we hold that a court may order a division of property acquired by a man and woman who are unmarried cohabitants, but who have considered themselves and held themselves out to be husband and wife. Such order may be based upon principles of contract, either express or implied, or upon a constructive trust. Factors to be considered in ordering such a division of property may include: the purpose, duration, and stability of the relationship and the expectations of the parties. Provided, however, that if either the man or woman is validly married to another person during the period of cohabitation, the property rights of the spouse and support rights of the children of such man or woman shall not in any way be adversely affected by such division of property.[15] The expectations of the parties under these circumstances would be equitable treatment by the other party in exchange for engaging in such a cohabiting relationship.

Our holding, of course, is subject to the evidence presented to the trial court by the party seeking relief. Such evidence must prove that the parties' nonmarital cohabiting relationship was based upon a valid contract, either expressly or one which may

---

**13.** *See W.Va.Code,* 48–2–32 [1984].

**14.** In *Morone v. Morone,* 50 N.Y.2d 481, 413 N.E.2d 1154, 429 N.Y.S.2d 592 (1980), the Court of Appeals of New York refused to find an *implied* contract between unmarried cohabitants, suggesting that such a decision would be tantamount to recognizing common-law marriage. *Id.* at 489, 413 N.E.2d at 1158, 429 N.Y.S.2d at 596. However, express contracts were approved in that case.

**15.** Under the facts of this case, the parties lived together for an extended period of time, considered themselves as husband and wife, and, in fact, pooled their resources to include taking property under three joint deeds. Therefore, in this case, the equities are more easily deter-

mined than in a relationship between two parties which was for a shorter duration, or where the parties did not consider themselves to be husband and wife, or where the parties did not pool their resources. Cases in other jurisdictions have noted that "[e]ach case should be assessed on its own merits with consideration given to the purpose, duration and stability of the relationship and the expectations of the parties." *Hay v. Hay,* 100 Nev. 196, 199, 678 P.2d 672, 674 (1984). *See also Omer v. Omer,* 11 Wash.App. 386, 392, 523 P.2d 957, 961 (1974) ("[D]o those findings [of fact by the trial court] support either a constructive trust or an implied partnership, to justify the division of property decreed?").

be inferred from the evidence. Similarly, in the absence of a valid contract, a party claiming relief must demonstrate that equitable principles would provide the relief being sought.[16]

### IV

Accordingly, the first certified question is answered in the negative; the second certified question is answered in the affirmative. This case is remanded to the Circuit Court of Lincoln County for further proceedings consistent with this opinion.

Having answered the certified questions, this case is dismissed from the docket of this Court.

Certified questions answered; case remanded.

---

**16.** Our holding in this case does not extend to court-ordered support following cohabitation, or, "palimony," as it is popularly known. With regard to this type of support, the following has been observed:

> Any court-ordered support after the end of cohabitation will be under contract theories because the current law pertaining to alimony and maintenance is based on statutes which use terms such as 'wife' or 'spouse.' Despite popular use of the term 'palimony' to indicate non-contractual support after cohabitation based on one cohabitants' [sic] need and the

other's ability to pay, there appears to be no case in which a court, after trial, awarded such permanent support and was upheld on appeal.

*Family Law and Practice* § 65.01[3], at 65–8 (A. Rutkin gen. ed. 1989).

This state's statute, namely, *W.Va.Code,* 48–2–1(a) [1990] defines "alimony" as meaning "the allowance which a person pays to or in behalf of the support of his or her *spouse* or divorced *spouse* while they are separated or after they are divorced." (emphasis supplied)