400 S.E.2d 809

**Karen J. THOMAS, also known as Karen J. LaRosa**

v.

**James D. LaROSA.**

No. 19629.

Supreme Court of Appeals of West Virginia.

Nov. 9, 1990.

Concurring Opinion of Justice Miller Dec. 19, 1990.

Clark B. Frame, Wesley W. Metheney, J. Michael Benninger, Wilson, Frame & Metheney, Morgantown, for Karen J. Thomas (LaRosa).

James A. Varner, Catherine D. Munster, McNeer, Highland & McMunn, Clarksburg, for James D. LaRosa.

NEELY, Chief Justice:

This case presents the following certified question from the Circuit Court of Harrison County:

Are agreements (express or implied) which are made between adult non-marital partners for future support and which are not explicitly and inseparably founded on sexual services enforceable?

Stated another way, we are asked to decide today whether moral standards have changed sufficiently in the last thirty years that a man can now be married to two women at the same time. Our answer is an emphatic "no."

On 4 August 1989, the appellant, Karen J. Thomas (who in the caption sets out that she is "also known as Karen J. LaRosa") filed a civil action against the appellee, James D. LaRosa, alleging that, *inter alia*, the parties agreed that they would hold themselves out and act as husband and wife. Appellant asked the court to enforce an alleged oral contract under which the appellee agreed to provide financial security for appellant for her lifetime and to educate her children. The appellee moved to dismiss the complaint for failure to state a claim upon which relief could be granted and the circuit court granted the motion. Thus, what we have before us are only the appellant's original complaint and her affidavit in opposition to the motion to dismiss, both of which we must assume to be true for the purpose of answering the certified question.

According to the complaint, in August, 1980, the parties became acquainted while both were living in Clarksburg, West Virginia. Thereafter, during the Spring of 1981, appellant and appellee agreed that they would hold themselves out and act as husband and wife. It was further agreed that appellant would perform valuable services for appellee, including being his companion, housekeeper, confidante and business helper. In consideration of the valuable services and obligations undertaken and performed by appellant, appellee promised and agreed to provide financial security for appellant for her lifetime and to educate appellant's children. Appellee carried out such agreement for approximately eight years, but now has breached and reneged.

At the appellee's insistence and in furtherance of their agreement, appellant relocated to Atlanta, Georgia, in August of 1984. The parties obtained a house that is jointly owned by them. The parties consulted and agreed on where the house would be located and the manner in which it would be furnished. Appellee provided the money to buy, furnish and maintain the house. From the Spring of 1981 until July, 1988 appellant continued to provide valuable services to appellee as agreed, and appellee provided financial support and security for appellant and her children. Then in July, 1988, appellee breached and refused to continue to honor his agreement to provide support for appellant and her children.

According to appellant's affidavit, she is thirty-eight years old and the mother of three daughters. From the beginning of their relationship, appellee pressured appellant and demanded her attention by visiting her place of employment frequently and by telephoning her and eventually by visiting her in her home. Although appellant knew that appellee was married, appellant alleges that appellee represented to her that he had no meaningful relationship with his

wife, but was unable to obtain a divorce for financial reasons.

At first, appellant's relationship with appellee began as a friendship; later, however, appellant worked and traveled with appellee as he began the construction of the East Point Mall in Bridgeport, West Virginia. Appellant routinely discussed business ideas and suggestions with appellee about the development of the mall. Appellant alleges that it was she, in fact, who suggested the name chosen for the mall. Appellant traveled extensively with appellee on business trips designed to evaluate potential businesses to be located within the East Point Mall. She acted as his business assistant and helped appellee decide which hotels to solicit for incorporation into the mall complex.

In addition, appellant provided valuable assistance to appellee in the planning and development of a golf course that was to serve the corporate market. At times appellee would use appellant as a "sounding board" for his ideas and plans. Appellant and appellee would discuss, explore and talk about how the golf course would be developed.

Appellant further averred that during the time of her relationship with appellee, appellee demanded a commitment that she be available to work and travel with him as he directed. Appellee further requested that appellant relocate to Georgia. In exchange for the appellant's trust, commitment and valuable services provided, appellee (according to appellant's affidavit) agreed as follows:

> At that time he realized how hard it would be for both of my children and myself to move to Georgia and to leave family, to leave friends. And he was trying to make the transition as easy as he could. We went together and we got a house, we leased a house. At that point, he promised if I would make the move and the transition to Georgia, to be there for him, to help him; then he would buy a house for me, provide for myself and my children for the rest of our lives.

In explaining the extent of appellee's assurances, appellant testified that appellee promised her, as well as her mother and her father, that "he would take care of their education and their uprooting—they would not lose because they [children] were uprooted and left everything." Appellee further reassured appellant and her family by stating that:

> I'm going to take care of her and those children for the rest of their lives, there is no problem, there shouldn't be a fear, she shouldn't be afraid.

Appellant alleges that she not only left the Clarksburg area, but removed herself, at the direction of the appellee, from her family, her friends and her work. At the time of making the agreement with appellee, appellant was working at Lockheed in Clarksburg, West Virginia. Speaking about the impact of the move on her daughters, appellant stated that while in Clarksburg they were very active in the community and in high school. They were both varsity cheerleaders, members of the homecoming court, and either president of the student body or president of the student council. She reiterated that "we left the family, we left friends."

Pursuant to his agreement, appellee did, in fact, undertake to support and maintain appellant and her children. He provided appellant with a monthly stipend of $3,000 and covered the household expenses. Appellee also initially undertook to support and educate appellant's children.

## I.

■ At the outset we must point out that this is *not* a case of alleged common-law marriage. The appellant admits that at the time she entered into the putative contract she knew that the appellee was already married. Thus this case is easily distinguished from *Goode v. Goode*, 183 W.Va. 468, 396 S.E.2d 430 (1990) where we recognized that under circumstances that would give rise to a common-law marriage in many states, there is a right in West Virginia to equitable distribution of property acquired during the course of the relationship. Although in Syllabus Points 1 and 2 of *Goode*, we reaffirmed that common-law marriages are not valid in this

State, and that every marriage here must be solemnized under a license, we went on to say in Syllabus Point 3:

> A court may order a division of property acquired by a man and woman who are unmarried cohabitants, but who have considered themselves and held themselves out to be husband and wife. Such order may be based upon principles of contract, either express or implied, or upon a constructive trust. Factors to be considered in ordering such a division of property may include: the purpose, duration, and stability of the relationship and the expectations of the parties. *Provided, however, that if either the man or woman is validly married to another person during the period of cohabitation, the property rights of the spouse and support rights of the children of such man or woman shall not in any way be adversely affected by such division of property.* [Emphasis added.]

## II.

Appellant directs the Court's attention to an emerging body of law across America concerning "palimony," particularly the case of *Marvin v. Marvin,* 18 Cal.3d 660, 134 Cal.Rptr. 815, 557 P.2d 106 (1976), appeal after remand, 122 Cal.App.3d 871, 176 Cal.Rptr. 555 (1981), and its progeny. In the famous *Marvin* case, the film actor Lee Marvin had a long-term but unsolemnized relationship with a woman who sued him for alimony and a division of property when their cohabitation ended. The court granted limited relief under the applicable California statutes and decisional law, but in the *Marvin* case, Lee Marvin was unmarried (as the result of a recent divorce) during most of the time that he lived with the plaintiff, and was decidedly unmarried at the time the complaint was filed.

Furthermore, in almost all of the cases on "palimony" that followed the path blazed by *Marvin,* the defendants involved were unmarried at the time the cause of action arose.[1] In fact, a California appeals court, in *Taylor v. Fields,* 178 Cal.App.3d 653, 224 Cal.Rptr. 186 (1986), held that the mistress of a married man could not recover on a *Marvin* theory of contract, because:

> ... there is no showing of stable and significant cohabitation and it is based upon illicit meretricious consideration. Here, both parties are *in pari delicto* in an adulterous relationship as Leo was married to someone else, and Taylor knew that fact.

*Id.* at 666, 224 Cal.Rptr. at 194. When a California appeals court draws the line for *Marvin* relief at adultery, it is no wonder that there are so few appellate cases involving women who want court-ordered support for relationships with married men.

## III.

The appellant attempts to circumvent the longstanding rule in all American states

---

**1.** The leading case where *Marvin* relief was given to the extramarital partner of a married person is *Koslowski v. Koslowski,* 80 N.J. 378, 403 A.2d 902 (1979). In that case, the plaintiff, an unmarried woman, lived with a married man. The court rejected the woman's claim to alimony or equitable distribution, but gave a nominal award of $55,000 on a breach of contract theory. The court found that there was no legal impediment to the parties' cohabiting in 1968, because the relationship involved no illegal conduct. The court had already held New Jersey's fornication statute to be unconstitutional as applied to adults. *State v. Saunders,* 75 N.J. 200, 381 A.2d 333 (1977), and, effective 1 September 1979, fornication ceased to be a crime under New Jersey statutes. In addition, under New Jersey law, a male, married or unmarried could be guilty of adultery only if he had sexual relations with a married woman. Thus, the court held that the relationship was not meretricious. *Id.* at 386–87, 403 A.2d at 907. At least one other court has gone the way of the *Koslowski* Court, and has held that the fact that a man was married did not bar his non-marital partner from recovering on a breach of contract action. *Mullen v. Suchko,* 279 Pa.Super. 499, 421 A.2d 310 (1980). The facts of the *Mullen* case resemble those of the case before us, in that the man agreed that if the woman would leave her job and make herself available to travel with him and spend time with him, he would take care of her for the rest of her life.

In West Virginia, however, there is a legal impediment to unmarried cohabitation as man and wife. Such cohabitation is illegal under *W.Va.Code,* 61–8–4 [1923], and our adultery statute, *W.Va.Code,* 61–8–3 [1923], is not limited in the perverse manner that New Jersey's statute is limited. Thus, under West Virginia law, we must take a dim view of adulterous relationships.

that a valid contract cannot be founded on meretricious consideration by alleging that she performed valuable, business-related services for Mr. LaRosa that can form an adequate consideration for the contract independent of any sexual favors. Indeed, the cases are legion in American law where men and women have entered into valid business relationships while at the same time also enjoying a sexual relationship. In *Collins v. Davis*, 68 N.C.App. 588, 315 S.E.2d 759, *aff'd*, 312 N.C. 324, 321 S.E.2d 892 (1984), the North Carolina Court of Appeals made it clear that cohabiting but unmarried persons are capable of "entering into enforceable express or implied contracts for the purchase and improvement of houses, or for the loan and repayment of money." 68 N.C.App. at 592, 315 S.E.2d at 762.[2]

Some courts have taken a very conservative approach to all contracts arising from unmarried cohabitation and denied any enforcement on the grounds that the meretricious consideration was inextricably linked to the valid consideration. For instance, in *Schwegmann v. Schwegmann*, 441 So.2d 316 (La.App.1983), a case resembling the one before us, the plaintiff, Ms. Mary Ann Blackledge [a.k.a. Schwegmann], lived with Mr. Schwegmann continuously for twelve years. She claimed that during the twelve years, she "rendered services as a companion, housekeeper and cook, as well as a mother to Mr. Schwegmann's children, and as a business advisor, political assistant and confidante to him and his controlled corporations." *Id.* at 320. However, there was more to the relationship:

> Throughout the time they lived together, Ms. Blackledge and Mr. Schwegmann had sexual relations on a regular basis. Ms. Blackledge's living expenses, dental and medical bills, clothing costs, entertainment and traveling expenses were paid for by Mr. Schwegmann. He also provided her with a monthly allowance check during their cohabitation and continued the checks after they ceased living together until the time this suit was filed. The sexual relationship also continued during visits after the cohabitation had terminated.

*Id.* at 320.

The court in *Schwegmann* held that the plaintiff had no cause of action to recover in quantum meruit because "the domestic services were inextricably interwoven with the sexual relationship," 441 So.2d at 325, and "Louisiana law clearly disallows claims in quantum meruit by concubines for domestic services when the services are interwoven with the sexual relationship." 441 So.2d at 324.

Most courts, however, in keeping with contemporary moral standards, have attempted to scrutinize such cases carefully and to enforce legitimate business expectations whenever the business part of a contract between cohabiting or romantically attached partners can be separated from the personal part. In *Tyranski v. Piggins*, 44 Mich.App. 570, 573, 205 N.W.2d 595, 596 (1973), a Michigan appeals court noted:

> While the parties illicitly cohabited over a period of years, that does not render all agreements between them illegal. Professor Corbin and the drafters of the Restatement of Contracts both write that while bargains in whole or in part in consideration of an illicit relationship are unenforceable, agreements between parties to such a relationship with respect to money or property will be enforced *if the agreement is independent of the illicit relationship.* [Emphasis added]

In a footnote, the court then cited "6A Corbin, Contracts, § 1476, p. 622; 2 Restatement of Contracts, §§ 589, 597, pp. 1098, 1108." 44 Mich.App. at 573, 205

---

**2.** The Court pointed out, however, that if illicit sexual intercourse had provided the consideration for the contract or implied agreement, all claims arising from the contract would be unenforceable.

It is worth noting that in the *Collins* case, the plaintiff was married at the time the parties lived together and the house was bought, but that the theory of relief was very different from a *Marvin* theory of "palimony" relief. Holding that a plaintiff's illicit relationship with a defendant does not deny him the right to recover money or assets unjustly retained by his former partner is very different from holding that an adulterer acquires *by virtue of the adulterous relationship* property rights of the kind a spouse acquires from marriage.

N.W.2d 595, at 596. For instance, an agreement to pay for services as a housekeeper is not made invalid by the fact that a meretricious relationship exists between employer and employee, if the agreement is wholly separate from the relationship. *Lovinger v. Anglo California Nat. Bank*, 243 P.2d 561 (Cal.App.1952). For a similar case, *see, Stewart v. Waterman*, 97 Vt. 408, 123 A. 524 (1924). Also, in *Burns v. Koellmer*, 11 Conn.App. 375, 527 A.2d 1210 (1987), an adulterous affair between a tennis club manager and tennis club operator did not preclude enforcement of an alleged contract between the two, because the contract did not concern the parties' living arrangements or sexual behavior.

This case, however, does not fall into the latter category of cases because Mrs. Thomas is widely known under the sobriquet "Mrs. LaRosa." Furthermore, the damages that the appellant seeks are not the type of definitely ascertainable and foreseeable contract damages that would ordinarily arise from a sour business deal; rather, the claimed damages are exactly those to which a faithful wife would be entitled upon the dissolution of a valid marriage. If the appellant was a simple employee of the appellee, as she contends based upon her services as a maid and social secretary, she was certainly compensated adequately during her employment by a monthly salary of $3,000, living expenses, and the provision of an attractive and well furnished house.

■ The type of "business consulting services" appellant alleges that she performed—namely, chewing the fat with the appellant over the advisability of certain business decisions—are typical of the services performed by most wives who are in the good graces of their husbands. Finally, traveling with and entertaining for a man are not such services that a court can determine to be so distinctly business-related as to be entirely separable from illegal meretricious consideration.

### IV.

With the entry of women today into all types of jobs, from coal mining to brain surgery, that thirty years ago were thought to be the exclusive preserves of men, there will inevitably be occasions when legitimate business relationships become intertwined with romantic relationships. Men and women simply interact with one another at more levels and on more occasions than was the case thirty years ago. Therefore, our holding today does not foreclose the enforcement of legitimate business contracts (e.g., one between a female coal broker and a male mine operator) merely because the contracting parties are of the opposite sex and may have had an affair or cohabited for an extended period.

■ But, unlike the case before us, contracts between men and women to deliver a certain quality of coal on a certain date and at a certain location are obviously business contracts and their breach creates definitely ascertainable contract damages. Equally obviously, a contract between a man and a woman under which the two agree to hold themselves out as husband and wife, the woman agrees to cohabit, keep house and entertain friends, while the man agrees to support the woman and take care of her for life, amounts to a contract of common-law marriage which is not valid in this State. *State v. Bragg*, 152 W.Va. 372, 163 S.E.2d 685 (1968); *Kisla v. Kisla*, 124 W.Va. 220, 19 S.E.2d 609 (1942); *Fout v. Hanlin*, 113 W.Va. 752, 169 S.E. 743 (1933); *Kester v. Kester*, 106 W.Va. 615, 146 S.E. 625 (1929); *Beverlin v. Beverlin*, 29 W.Va. 732, 3 S.E. 36 (1887); *Pace v. Celebrezze*, 243 F.Supp. 317 (S.D.W.Va.1965).

■ To enforce such a contract when one party is already married would amount to the condonation of bigamy and such enforcement would inevitably run afoul of the last proviso in syl. pt. 3 of *Goode, supra*, where we unequivocally denied the enforcement of living together contracts if the rights of either a lawful spouse or children would be prejudiced. Although it is alleged that Mr. LaRosa is a man of immense wealth, continuing obligations of support to a woman who is essentially a second wife must, *ipso facto*, prejudice the rights of a lawful wife and her legitimate children.

Marriage is a central secular institution in this society. For example, marriage bestows property interests upon a wife or hus-

band simply by virtue of marriage in such public and private programs as social security, veterans benefits, workers compensation, and group medical insurance. These programs are more or less actuarially sound, but they cannot remain so if persons are allowed to be married to more than one person at a time. Furthermore, the solemnization of a marriage immediately gives each spouse property rights like dower in the estate of the other spouse, and marriage severely circumscribes the discretion of either spouse with regard to descent and distribution of property at death. Thus, because of the intricate property relationships that marriage implies, this State has an orderly way for allocating property rights accrued by virtue of marriage at the time the marriage is dissolved. This process is called "divorce," and in this State going through the formal divorce process is a condition precedent to the taking of a second wife or husband.

Lawfully married women are entitled to more than bare subsistence from their husbands, and their children are entitled to a decent standard of living unencumbered by the claims of judgment creditors whose cause of action is based on adulterous relationships. Inevitably if a man attempts to support more than one wife or more than one family at a time the living standard of the lawful wife *must* suffer as a matter of law.

Accordingly, for the reasons set forth above, the judgment of the Circuit Court of Harrison County answering the Certified Question in the negative is affirmed.

Certified Question Answered.

MILLER, J., concurs and reserves the right to file a concurring opinion.

MILLER, Justice, concurring:

I concur in the result reached by the majority that Mr. LaRosa is not subject to the financial claims of Karen J. Thomas because Mr. LaRosa is a married person. Most courts have confined this type of claim to unmarried persons who cohabit together so long as the agreement for financial support or accumulated asset division can be found to exist on grounds other than meretricious sexual services. *E.g., Levar v. Elkins,* 604 P.2d 602 (Alaska 1980); *Marvin v. Marvin,* 18 Cal.3d 660, 134 Cal.Rptr. 815, 557 P.2d 106 (1976); *Boland v. Catalano,* 202 Conn. 333, 521 A.2d 142 (1987); *Kinkenon v. Hue,* 207 Neb. 698, 301 N.W.2d 77 (1981); *Dominguez v. Cruz,* 95 N.M. 1, 617 P.2d 1322 (Ct.App. 1980); *Suggs v. Norris,* 88 N.C.App. 539, 364 S.E.2d 159, *cert. denied,* 322 N.C. 486, 370 S.E.2d 236 (1980); *Beal v. Beal,* 282 Or. 115, 577 P.2d 507 (1978); *Warden v. Warden,* 36 Wash.App. 693, 676 P.2d 1037, *review denied,* 101 Wash.2d 1016 (1984); *Watts v. Watts,* 137 Wis.2d 506, 405 N.W.2d 303 (1987).

Were Mr. LaRosa not married, I believe the certified question would be answered in the affirmative. Ms. Thomas's suit would survive the motion to dismiss and the question would then be the proof of the agreement and whether there was in fact an independent basis for the contractual considerations that were not meretricious.

The majority's view on this issue is difficult for me to unravel. Certainly, our holding in Syllabus Point 3 of *Goode v. Goode,* 183 W.Va. 468, 396 S.E.2d 430 (1990), would support this view.[1] In *Goode,* neither of the parties was married, they cohabited over a lengthy period, holding themselves out as husband and wife, and they had four children. We refused to alter our prior law and recognize a common law marriage. However, in Part III of *Goode,* we discussed their rights *inter se* and cited *Marvin v. Marvin, supra,* and a

---

1. Syllabus Point 3 of *Goode* is:

"A court may order a division of property acquired by a man and woman who are unmarried cohabitants, but who have considered themselves and held themselves out to be husband and wife. Such order may be based upon principles of contract, either express or implied, or upon a constructive trust. Factors to be considered in ordering such a division of property may include: the purpose, duration, and stability of the relationship and the expectations of the parties. Provided, however, that if either the man or woman is validly married to another person during the period of cohabitation, the property rights of the spouse and support rights of the children of such man or woman shall not

number of other cases that followed it to support our conclusion that principles of express or implied contract or constructive trust could be applied. I do not view today's opinion as a retreat from *Goode*.

I believe there is some confusion concerning the language of the proviso in *Goode*'s Syllabus Point 3.[2] Certainly, this proviso might be read, as Ms. Thomas argues, that so long as the distribution of property between the cohabiting couple does not affect the rights of a spouse and support rights of children, it is permissible. It would have been more frank for the majority to acknowledge that this could be a possible interpretation of the proviso, but to say forthrightly that it is not what was intended. Instead, the majority chooses in its Syllabus Point 1 to emphasize the proviso as if it clearly stated that under no circumstances can any financial claim be made where one of the cohabitors is married.

2. From a purely legal standpoint, it does not belong in *Goode*, as neither party had been previously married or had married during the period they cohabited, nor did they have any prior children. This issue would have been more properly addressed for the first time here.