405 S.E.2d 447

**JUDITH R.**

v.

**Honorable John HEY, Judge of the Circuit Court of Kanawha County.**

**No. 19212.**

Supreme Court of Appeals of West Virginia.

July 26, 1990.

Opinion Concurring and Dissenting in Part by Justice Brotherton
May 23, 1991.

Maureen Conley, Legal Aid Soc. of Charleston, Charleston, for Judith R.

Larry Skeen, Ripley, for Honorable John Hey and Rodney R.

WORKMAN, Justice:

In this petition for a writ of prohibition, petitioner Judith R.[1] seeks to prohibit enforcement of an order entered by the Honorable John Hey, Circuit Judge of Kanawha County, on August 23, 1989, reflecting the results of a hearing held July 27, 1989.

In that order, Judge Hey directed that petitioner had thirty days from the date of the hearing either to marry the man with whom she was cohabitating or to move out and establish separate living arrangements for her and her daughter. The court further ordered that if neither alternative was met within such time period, custody of the parties' fourteen-year-old daughter, Melissa, would be granted to the father, Rodney R., subject to reasonable visitation rights in the mother. The court further ordered that "by reason of plaintiff's (Mrs. R.'s) conduct," the defendant (Mr. R.) was not responsible for alimony or child support payments for such thirty-day period. The court set aside the family law master's recommendation that a change in petitioner's alimony was not warranted, once again based on "plaintiff's conduct," and remanded the matter back to the family law master with instructions that he hear further evidence and reconsider his recommendations. We grant petitioner's request for a writ of prohibition and remand this case for reinstatement of child support and alimony. We further direct that upon remand the court administrator of the Thirteenth Judicial Circuit assign this matter to another judge in the circuit.

Judith R. and Rodney R. were divorced by a final divorce decree dated January 27, 1988. In such final decree, the petitioner was granted custody of the two children, Melissa R. and Christopher, who has now reached the age of majority and is not involved in this proceeding. In September 1988, Melissa, who was then thirteen years old, decided she wanted to live with her father. Rodney R. subsequently filed a petition to modify in order to obtain custody of Melissa and modify his child support obligations.

In January, 1989, petitioner began living with Robert C. and his thirteen-year-old daughter in St. Albans. In April, 1989, Melissa began experiencing emotional problems and returned to live with her mother at Robert C.'s residence. A hearing before Judge Hey was held on April 25, 1989. At this hearing, Judge Hey ordered that a change in custody was warranted and, pursuant to agreement of the parties, the custody of Melissa was transferred from Rodney R. back to Judith R. This order was entered on August 15, 1989.

## CHILD CUSTODY

In an ideal world, this case would not be before us. Rodney and Judith R. would not have decided to divorce and Melissa would not be living with only one parent. They would have lived happily ever after and provided their children with a stable, loving home with two parents present. But as we are painfully aware, the world is not a perfect place. Divorce is a widespread phenomenon and custody of children becomes at times a major battleground with deep emotional wounds to the children the frequent result. Similarly, the cohabitation of a single custodial parent with another person without benefit of marriage certainly does not create the ideal environment for children, and we have previously held that such cohabitation does constitute a sufficient change in circumstances to warrant re-examination of custody. In Syl. Pt. 3 of *S.H. v. R.L.H.*, 169 W.Va. 550, 289 S.E.2d 186 (1982) this Court held that:

> Where one parent has been awarded the custody of minor children by the court and that parent either remarries or undertakes a relationship with another adult who is either a permanent resident or regular overnight visitor in the home, the marriage or existence of such extramarital relationship constitutes a suffi-

---

**1.** Consistent with our practice in cases involving sensitive matters, we use parties' initials. *See Benjamin R. v. Orkin Exterminating Company, Inc.*, 182 W.Va. 615, 390 S.E.2d 814, n. 1 (1990) citing *In re Johnathan P.*, 182 W.Va. 302, 387 S.E.2d 537 n. 1 (1989); *State v. Murray*, 180 W.Va. 41, 375 S.E.2d 405, 408 n. 1 (1988).

cient change of circumstances to warrant a reexamination of child placement; however, neither remarriage nor an extra-marital relationship *per se* raises any presumption against continued custody in the parent originally awarded such custody.

In making any child custody decision, however, the chief and overriding concern must be the best interest of the child. We have previously held that "[t]o justify a change of child custody, in addition to a change in circumstances of the parties, it must be shown that such change would materially promote the welfare of the child." Syl. Pt. 2, *Cloud v. Cloud*, 161 W.Va. 45, 239 S.E.2d 669 (1977).

We have also held in *J.B. v. A.B.*, 161 W.Va. 332, 242 S.E.2d 248 (1978) that:

> Acts of sexual misconduct by a [primary caretaker], albeit wrongs against an innocent spouse, may not be considered as evidence going to the fitness of the [caretaker] for child custody *unless [his or] her conduct is so aggravated, given contemporary moral standards, that reasonable men would find that [his or] her immorality, per se, warranted a finding of unfitness because of the deleterious effect upon the child of being raised by a [primary caretaker] with such a defective character.* (emphasis added)

*Id.* at Syl. Pt. 4, as modified by *Garska v. McCoy*, 167 W.Va. 59, 70, 278 S.E.2d 357, 363 (1981) (emphasis added). The same standard is applicable in a post-divorce context. A careful review of the whole record in this case is void of any evidence that Judith R. is an unfit parent or that her conduct has created any deleterious effect on the child. No findings of fact warranting a finding of unfitness were set forth by Judge Hey in the July 27 order.[2] Such order was grounded merely on the premise that the court would not "tolerate" Judith R.'s conduct. Although the circuit judge contends he is "following the law," he seems totally incognizant of any of these prior cases.

Furthermore, Melissa R. is over the age of fourteen years. At this age, the legislature of this state has granted *her* the right to nominate her own guardian. While W.Va.Code § 44-10-4 (1982) applies to circumstances where a guardian is to be appointed in lieu of a natural parent, we have previously found the statute to be "evidence of the legislature's conclusion concerning the age at which an adolescent should be given some substantial say in his own affairs." *S.H. v. R.L.H.*, 169 W.Va. 550, 555, 289 S.E.2d 186, 189 (1982). "The use of the word 'nominate' in Code, 44-10-4 [1982] means that unless the court finds the nominee unfit to serve as guardian, the nominee should be confirmed by the court." *Id.* After having lived with each of her parents separately, Melissa R. chose to live with her mother. There being no evidence in the record of the unfitness of Judith R. as a parent, we find Melissa's request a relevant, if not dispositive factor in our decision.

Justice Neely further elaborated on this subject in *S.H. v. R.L.H.*, and we find the rationale underlying the prior decision to be indeed noteworthy in the decision before us today. Justice Neely, writing the unanimous decision for this Court, set forth that:

> when children get old enough that they can talk intelligently and formulate reasonable opinions, their feelings concerning a stepparent or an adult sharing living quarters should be taken very seriously by a trial court judge. In this regard we expressly hold ... that the remarriage of a child's guardian or a permanent relationship in which a child's guardian and another adult share living quarters constitutes a significant change in circumstances and upon proper motion, warrants inquiry by the trial court into the relationship between the child and the new adult with particular attention to the child's preference for where

---

2. Indeed, there appears to have been no evidence taken on this issue. A review of the record of the proceedings before the family law master does not reflect that any evidence was heard there on the issues of fitness or best interest of the child, and the circuit court apparently made its determination without any evidentiary basis.

he or she wishes to live if the child is capable of articulating an intelligent opinion on the subject. However, remarriage or a relationship with another adult, *per se*, raises no presumption against continued custody in the parent who was originally awarded custody.

169 W.Va. at 557, 289 S.E.2d at 191. Although a trial court has discretion in custody situations, such discretion can be abused. We have previously held that:

> [t]he exercise of discretion by a trial court in awarding custody of a minor child will not be disturbed on appeal unless that discretion has been abused; however, where the trial court's ruling does not reflect a discretionary decision but is based upon an erroneous application of the law and is clearly wrong, the ruling will be reversed on appeal.

Syl. Pt. 2, *Funkhouser v. Funkhouser*, 158 W.Va. 964, 216 S.E.2d 570 (1975). We find that Judge Hey abused his discretion by altering the custody of this child without any evidentiary basis concerning the best interests of the child and based on an erroneous application of law. We therefore grant petitioner's request for a writ of prohibition. Such writ shall issue to prohibit enforcement of the order of Judge Hey dated July 27, 1989.

## CHILD SUPPORT

■ The second issue involves the lower court's order that during the thirty-day period the petitioner was given to marry or move out, child support was to be suspended "by reason of (petitioner's) conduct." Clearly this was an improper order and an abuse of the court's discretion. Although it cannot be mandated that the wages of the cohabitor be used to pay child support, the cohabitor's income is taken into consideration under the child support guidelines adopted by the West Virginia Department of Human Services. *See* West Virginia Code of State Rules § 78–16–1 to 78–16–20. But without any evidentiary basis for even applying the standards, it is unclear upon what reasoning the court concluded it could properly wreak an essentially punitive result on the child as a result of the mother's conduct. "A child support order may be

modified only upon a substantial change of circumstances ... and upon a showing that the benefit of the child requires such modification. W.Va.Code § 48–2–15(e) (1986)." Syl. Pt. 1, in part, *Lambert v. Miller*, 178 W.Va. 224, 358 S.E.2d 785 (1987).

## ALIMONY

■ The third issue relates to petitioner's right to alimony from her former husband in light of her cohabitation with another person. In the order dated August 23, 1989, the circuit court set aside the family law master's recommendation that no adjustment of alimony was warranted; found that "in view of plaintiff's conduct the defendant's exception is well-taken"; and remanded such issue to the Family Law Master for reconsideration. The court's authority to modify an alimony award is set forth in W.Va.Code § 48–2–15 (Supp.1990). Subsection (e) provides that an alimony award may be changed, "as the altered circumstances or needs of the parties may render necessary to meet the ends of justice." *Id.* In *Wight v. Wight*, 168 W.Va. 334, 284 S.E.2d 625 (1981) appellant made the argument that the appellee's cohabitation with another man should relieve the appellant from the obligation of paying alimony. We determined that W.Va.Code § 48–2–15 "makes no reference to the conduct of the parties after the granting of a divorce. Rather it makes their financial circumstances and needs and the requirements of justice the factors to be considered in determining whether an alimony award should be modified." *Id.* 168 W.Va. at 337, 284 S.E.2d at 626–27. In the event a petition for modification on this basis is filed, we reiterate that, pursuant to *Wight v. Wight*, an ex-wife's cohabitation with an adult male not her husband does not constitute grounds for termination or reduction of alimony award absent showing of change in financial condition of ex-wife by reason of contribution by the person with whom she cohabits.

## MANDAMUS AND REMAND ISSUES

■ On November 6, 1989, as part of petitioner's reply to respondent's response,

petitioner requested that in the event of a remand of any of the issues in this case to the circuit court, that this Court direct that such remand be to some other circuit judge. As the basis for this motion, petitioner cites the joint response of Judge Hey and Rodney R., its allegations of facts relating to the underlying case and its consequent appearance of impropriety. No response to the motion nor denial of its allegations was ever filed by the respondent circuit judge.

In addition, on November 13, 1989, petitioner filed a petition for a writ of mandamus seeking to have the respondent circuit judge ordered to refrain from making public comment on this case and related matters still pending in the circuit court. This petition, to which no answer or denial was filed by the circuit court judge, alleged *inter alia* that the respondent circuit judge had made several comments to the press and had appeared on "Crossfire", a national television network program on November 8, 1989, to discuss the specific facts and issues in this case, including not only the matters before this Court but also those left unresolved in the circuit court. Petitioner further alleged that the circuit judge on that program made conclusory statements as to the child's educational performance and church attendance and the mother's fitness and character, matters upon which no evidence was taken below and which the lower court had apparently accepted based upon hearsay outside any judicial setting.[3]

The judge is alleged to have made, and did not deny making, comments on "Crossfire" adverse to petitioner's reputation, character, and motivations, again for which there was no evidentiary basis whatsoever and which seem to indicate a bias and prejudice against the petitioner.[4] Since no evidence was taken as to any of these matters, one is left to wonder where the judge came into possession of this information.

As we have previously held, it is a "general rule in prohibition proceedings (that) any person whose rights may be affected by the issuance of a writ must be made a party and must be given notice of the proceedings." *State ex rel. Hanley v. Hey*, 163 W.Va. 103, 107, 255 S.E.2d 354, 356, *cert. denied*, 444 U.S. 928, 100 S.Ct. 269, 62 L.Ed.2d 185 (1979). Certainly a judge has a right to respond to a rule to show cause why he should not be prohibited from judicial actions. Furthermore, it is not unusual for the respondent judge and the party adverse to the petitioner in a prohibition action to file a joint response, because in this context "[t]he interests of the respondent judge and the probationer are identical as both seek to preclude issuance of the writ of prohibition."

The interests are the same, but only to the extent that both the judge and the adverse party contend that the judge did not exceed his legitimate powers in making the ruling which is the subject of the prohibition. Most certainly, however, the interests cannot be said to be the same as to the merits of the issues in the underlying case,

**3.** The judge is alleged to have commented that "[t]he elder of the church says she's been [to church] three times since [the child's] been living with her mother and this man, and I might point out, her grade point average while with her mother was 1.5 out of a 4.0 average, and while with the father was a 3.15 and further she has missed 22 out of 45 days while living with her mother."

**4.** The judge's comments included: "She's (referring to another participant in the "Crossfire" debate) talking about love and affection as if this were a stable family unit. This is not perhaps the first boyfriend."

After being asked if the daughter hadn't indicated a preference to live with her mother, the judge commented

"She said this after she lived with the mother, then she lived with the father and the mother was going to lose obviously some child support ... So the mother obviously, uh, convinced the girl to come back with her."

"My primary concern, and I want to make this clear, is for the welfare of that child, and I don't think it is in the welfare, the best interests of a child 13 years old to see her mother sleeping with a man that is not her father, and next week there may be a different man in the house, and the third week there may be a third one."

"I'm not into sexy kink,.... I don't care what two consenting adults do in the privacy of their own quarters. But it genuinely concerns me when they do it in the presence of children, that concerns me."

for in that context the judge must remain neutral and unbiased.

The problem with the joint answer filed by the circuit judge and Mr. R. is that it clearly reflects much more than a mere community of interest as to the circuit court's jurisdiction and authority to enter the order at issue. In that joint response, the circuit judge alleges *inter alia:*

—that the petitioner is attempting to perpetrate a "fraud" against her ex-husband and the circuit court;

—facts adverse to the petitioner that are *dehors* the record (i.e. information relating to the child's academic performance and school attendance record; and hearsay concerning the mother's and child's church attendance);

—that petitioner and "her paramour" are violating criminal and moral law on a daily basis. Again, this conclusion is drawn by the court without ever having heard any evidence.

—sexual promiscuity on the petitioner's part, again without any evidentiary basis for such finding, and in the face of a specific denial of such conduct by petitioner;

—that the cohabitation of petitioner with another person is an "illegal and reprehensible activity which is obviously occurring in the presence of and affecting a teen-age daughter who should be receiving lessons in morality and chastity rather (than) a home study course in promiscuity."

—the child's emotional problems resulted from the mother's "illicit misconduct."

These are the types of issues that should properly be heard and considered in an evidentiary setting, but which the circuit court apparently accepted and alleged in his response without ever having heard or even reviewed any evidence relating thereto. It is obvious that Judge Hey has exceeded the role he could properly take in defending his ruling, and is acting in his response as a partisan. It is also obvious he has formed opinions on factually disputed issues without ever having heard or reviewed any evidence in a judicial setting. The judge's appearance on television further substantiates his bias against the petitioner.

We found in syllabus point 2 of *Judicial Inquiry Comm'n v. McGraw*, 171 W.Va. 441, 299 S.E.2d 872 (1983) that "[t]he public expression of a judge as to a legal issue does not automatically require his later disqualification when the issue is presented to him in a specific case." Similarly, we held in syllabus point 5 of *State v. Ellis* 161 W.Va. 40, 239 S.E.2d 670 (1977): "A trial judge's public statements that he believes sound public policy requires persons convicted of drug-related offenses be sentenced to the penitentiary do not create such a bias or prejudice against a particular defendant to justify disqualification of the judge." Furthermore, Canon 4(A) of the Judicial Code of Ethics provides that a judge "may speak, write, lecture, teach, and participate in other activities concerning the law, the legal system, and the administration of justice." But Canon 3(A)(6) of the Judicial Code of Ethics states that a judge "should abstain from public comment about a pending or impending proceeding in any court, . . . ."

An analogous case arose in the Connecticut case of *Papa v. New Haven Feder'n of Teachers*, 186 Conn. 725, 444 A.2d 196 (1982). In that case, a judge in the Judicial District of New Haven was the subject of two recusal motions in a case involving contempt proceedings against striking teachers. The first motion to recuse was made on the basis of a speech given by the judge in which he discussed teacher strikes. The second motion to recuse was made on the basis of a newspaper interview given by the judge. In the speech, the general theme of which involved the obligation to obey the law, the judge criticized illegal teacher strikes, but his remarks were not generated by or made in reference to the impending teachers' strike. The newspaper interview, however, dealt quite specifically with the case pending before the judge. Amongst other comments, the judge was quoted as saying that he was "ready to jail more" teachers if the strike was not settled by Monday; that teachers "aren't fooling anybody. The vast majori-

ty of the people recognize they are striking for more money;" that "of all people, teachers shouldn't strike. They are inviting further disciplinary problems in the schools." 444 A.2d at 208.

The Supreme Court of Connecticut determined that the speech did not require the judge's disqualification. "In the course of their duties, judges frequently express opinions about specific laws, the obligation to obey the law and the consequences of disobedience. Given that such judicial expressions of opinion do not disqualify judges from sitting on later cases involving the same legal issues, it is difficult to perceive why judges' general, extrajudicial comments concerning legal issues disqualify them from hearing later cases involving those issues." *Id.* at 206.

Conversely, however, the court determined that the newspaper interview the judge gave concerning the specific proceeding pending before him was a clear violation of the Code of Judicial Conduct. *Id.* at 208. Furthermore, the court concluded that the judge's comments had, in effect, made him an unsworn witness without allowing the defendants an opportunity to offer testimony to refute the judge's assertions. His comments raised a reasonable question about his ability to remain fair and impartial, and constituted sufficient grounds for his recusal. *Id.* at 210.

■ Judge Hey's acceptance of facts not in the record, together with the scurrilous aspersions he casts upon the petitioner's character both in his response to the petition and on the public airways, goes far beyond the acceptable realm of comment as to the law or judicial philosophy. Although a judge shares a community of interest with a party in a proceeding before him in defending his jurisdiction and authority when the other party seeks to limit such authority in a prohibition action, that community of interest is strictly limited to the issue of whether the judge exceeded his legitimate powers in making the ruling of which the party complains. A judge who

demonstrates a bias and prejudice against the other party on the underlying issues will be precluded from presiding over the case upon remand.

We find that Judge Hey has departed from his neutral role on the underlying case. Therefore, upon remand, we direct the court administrator of the Thirteenth Judicial Circuit to assign this case to another judge in the circuit.[5]

Based on the foregoing, we grant petitioner's request for writ of prohibition and direct the circuit court to reinstate child support and alimony.

Writ of prohibition granted. Writ of mandamus denied.

BROTHERTON, Justice, concurring in part, dissenting in part:

I concur with the majority opinion in its findings of fact and conclusions of law dealing with child support and resulting in the award of a writ of mandamus that, on remand, orders this case referred to a different judge in the Thirteenth Judicial Circuit. However, I disagree with the sections of the majority opinion referred to as "Alimony" and "Child Custody."

In the case at hand, the record discloses that Judith R. had moved into a house with a man and his children for the purpose of having a home and living as a family. As a result, the circuit court relieved Mr. R. from making any further alimony payments, and Judith R. appealed. The majority reversed the circuit court and ruled that the alimony should be reinstated despite Judith R.'s living arrangements. The majority ignores the fact that had Judith R. married the man she was living with, the alimony would have ceased.

Is the marriage certificate the reason the alimony ceases? I think this reasoning is a major flaw in the majority's "enlightened" opinion: Why should the existence of a piece of paper control whether alimony payments continue when the recipient of the alimony is in a relationship that has all

---

**5.** Since this re-assignment solves the problem addressed by the petition for a writ of mandamus, it is not necessary to embark on further discussion on its merits or lack thereof and the mandamus is effectively denied.

the indicia of a marriage, lacking only the ceremony, the certificate, and a commitment. While the parties may lack a marriage certificate, they have clearly combined resources. Where is the justice that requires the payor to continue to make full alimony payments for support when the necessity for that support is lessened?

If the Court is to reach its conclusions based upon both law and logic, it necessarily follows that the alimony payments should be reduced by the amount contributed by the cohabitor. This Court reversed the circuit court's order granting Mr. R. relief from further payment of alimony despite Judith R.'s new relationship. Because of this illogical rationale and result, I dissent.

The issue of child custody is the most far reaching of the two issues discussed in this dissent. The majority is clearly wrong in permitting the fourteen-year-old child, Melissa R., to remain in the custody of her mother, Judith R., while she is openly cohabiting with a man and his family. In reversing the circuit court, the majority states: "In making any custody decision, however, the chief and overriding concern must be the best interest of the child."

Moreover, despite rhetorically claiming a real interest in young children, the majority hides behind this Court's decision in *J.B. v. A.B.*, 161 W.Va. 332, 242 S.E.2d 248 (1978). In syllabus point 4, the majority stated:

Acts of sexual misconduct by a mother, albeit wrongs against an innocent spouse, may not be considered as evidence going to the fitness of the mother for child custody unless her conduct is so aggravated, given contemporary moral standards, that reasonable men would find that her immorality, *per se*, warranted a finding of unfitness because of the *deleterious effect upon the child* being raised by a mother with such a defective character. (Emphasis added.)

The majority would be correct in relying on *J.B.* if this case dealt only with some isolated incidences of sexual misconduct by Judith R. But that is not this case. Judith R. moved into the home of a man not her husband and cared for both his children and her children, cohabiting as if they were man and wife. Wouldn't reasonable adults, or at least a majority of reasonable adults, believe Judith R.'s conduct has had the "deleterious effect on the child" discussed in *J.B.* and ignored by the majority opinion? *Id.*

If the Court is truly interested in the welfare of the child, why not consider cohabitation as evidence going to the fitness of the primary caretaker? What two consenting adults do is their business, but when that conduct affects the lives of children for whom they are role models, then the lifestyles of the primary caretakers must be given careful consideration. If the majority was sincere about the welfare of the child, they would have applied that part of syllabus point 2 of *J.B. v. A.B.*, discussed *supra*, which refers to the unfitness of a primary caretaker if the actions had a *deleterious effect* upon the child.

School counselors, church counselors, and teachers who work with young children are constantly attempting to educate the fertile minds of adolescents about the consequences of sexual activity before marriage. What answer does the counselor have when a youth says, "Mother doesn't have any commitment from the man she is living with, and she isn't concerned. Why should I?"

Today this State is near the top of the list of a very undesirable statistic—the number of teenage pregnancies. In fact, many public school systems now provide day care for the children of these teenage mothers in order that the mother might finish high school and have an opportunity for a meaningful future for herself and her child. Obviously, something is not working, and the majority apparently wants to contribute to the problem.

I am reminded of the biblical tale of Solomon, where two women each claimed to be the mother of a child. When parentage could not be resolved, Solomon said he would cut the child in half and give each "mother" a part. The true mother, filled with love for her child, preferred to give the child to the other woman rather than see him harmed. If Judith R. really loved

her child, she would have provided a stable family environment, even if she had to live alone. Her sacrifice would be bolstered by the knowledge that her child would be exposed to proper principles and conduct that would be building blocks for her life.[1] When the court told Judith R. to either show the court that she and the man she was cohabiting with intended to commit to each other and provide a sound foundation for Melissa or the child would be given to her father, Judith R., like the loving mother before Solomon, should have ascertained if the man she was living with intended to make a home for his children and her child through marriage. If not, she should have taken her daughter out of that environment to one where she, as a mother, could show her child true commitment.[2]

Child custody determinations are based almost purely upon court-made standards. It would appear from the majority opinion that our child custody standards are those which are the most expedient and economical at the time and do not consider the long-range welfare of the children it seeks to protect. While I acknowledge the majority's philosophical acceptance of divorce and its attendant problems, I do not have to either like them or accept them. Yesterday's standards are said to be out of date and have been replaced with "I am going to do my thing and let someone else worry about the consequences." In 1789, George Washington, the first President of this nation, stated that "... the foundations of our national policy will be laid on the pure and immutable principles of private morality...." I agree.

For these reasons, I dissent to the majority's standards for determining child custody.

---

1. *See also Parrillo v. Parrillo,* 554 A.2d 1043 (R.I.1989), where the Rhode Island Supreme Court held that the family court could prohibit a mother from spending the night with her cohabitant when her children were present.

2. See *Thomas v. LaRosa,* 184 W.Va. 374, 400 S.E.2d 809 (1990), where this Court ruled that express or implied agreements between adult non-marital partners for future support are not enforceable.