439 S.E.2d 442

Linda K. ANDERSON, formerly Linda Kay Newman, Plaintiff Below, Appellant,

v.

Victor R. NEWMAN, Defendant Below, Appellee.

No. 21501.

Supreme Court of Appeals of West Virginia.

Submitted Sept. 21, 1993.

Decided Dec. 15, 1993.

Dissenting Opinion of Justice Workman Dec. 17, 1993.

Roy D. Law, Buckhannon, for appellee.

Scot S. Dieringer, Clarksburg, for appellant.

PER CURIAM:

This is an appeal by Linda Newman from an October 29, 1992, order of the Circuit Court of Upshur County which granted custody of the Appellant's children to her former husband, Appellee Victor Newman. The Appellant urges this Court to reverse the decision of the lower court and to award

custody of the children to her. We affirm the decision of the lower court.

## I.

Linda and Victor Newman were divorced on March 23, 1990, after an intermittent five-year separation.[1] Two children had been born of the marriage, Nicholas, born January 21, 1985, and Alexander, born August 28, 1987. Pursuant to the initial divorce order, the Appellant was granted custody of both boys, and the Appellee was awarded limited visitation rights. The Appellee's rights to visit his children had been restricted based primarily upon an incident occurring in December 1988 in which Alexander's foot had been injured while he was under his father's care. The Appellee, despite the alleged seriousness of the injury, had failed to take Alexander to the hospital. Statements from a physician who later examined the foot indicated that the father should have sought immediate medical attention for the injury. The physician further opined that the failure to procure medical assistance should be considered in determining the father's visitation rights. Consequently, the Appellee was required to receive written instructions for the care of the children and was further required to hire a qualified child care worker to assist him during visitation.[2]

On March 17, 1990, the Appellant married George Anderson. She and Mr. Anderson were later separated, and she and the children moved to the state of Washington in November 1991. Prior to that relocation to Washington, the only significant dispute over custody or visitation arrangements involved a June 1990 contempt charge against the Appellant for refusing to permit a previously scheduled visit between the children and the Appellee.

Upon arriving in Washington for what was initially to have been a vacation and a visit to the Appellant's brother, the Appellant decided to remain in that state. On February 21, 1992, an Order was entered requiring the Appellant to supply phone numbers and addresses of the children. In April 1992, the Appellee visited the children in Washington without incident. In the summer of 1992, however, the parties attempted to arrange a summer vacation in which the boys would fly to West Virginia to visit their father. The parties apparently agreed that the Appellee would make reservations for the children to fly on USAir from Seattle to Pittsburgh on June 20, 1992, where they would be met by their father and transported to his home in Buckhannon. When the Appellant presented the children for their flight from Seattle, however, she was informed that the younger child was too young to fly without an adult. The Appellee had apparently erroneously reported the child's age as five instead of four.

The Appellant was unable to contact the Appellee in Buckhannon because he had already begun his trip to Pittsburgh to meet the children. Thus, when the Appellee arrived in Pittsburgh, he was surprised to discover that the children had not been permitted to board the plane. Upon discussing the situation with officials of USAir at the airport, he allegedly obtained permission for the children to make the flight later that day. He then telephoned the Appellant and instructed her to present the children at the Seattle airport for a different flight. The Appellant refused to do so, having been specifically informed by officials in Seattle that the younger child would not be permitted to fly without an adult.

On June 22, 1992, the Appellee contacted the Appellant[3] and informed her that he was

---

**1.** The Appellant is presently 43 years of age, and the Appellee is 54 years of age.

**2.** The requirement for the child care worker was phased out pursuant to a subsequent order in 1991.

**3.** According to a telephone log admitted as Appellee's exhibit number 1, a one-minute telephone call was made to the Appellant at 7:59 pm. The Appellee testified that he told the Appellant that he would be arriving in Seattle the next day

between 5:30 and 6:30 pm to pick up the children. According to the testimony of the Appellee, the Appellant informed him that her lawyer had said she did not have to talk to him and then hung up. The Appellant admits receiving that telephone call and testified that she understood that it was the Appellee's intention to come to Washington to accompany the children to West Virginia. She testified that she informed him that the itinerary was "not right" and that she needed "some assurances" from her attorney.

flying to Washington to obtain the children and accompany them back to West Virginia. When he arrived at the home of the Appellant, he discovered that the Appellant and the children had left the home. He then presented this matter to Washington law enforcement authorities as a child concealment case which resulted in an official attempt to locate the children. The Appellee also obtained the services of an attorney in Washington, and a habeas corpus proceeding was held. The Appellant and the children were located, and the Appellee obtained physical custody of the children on July 9, 1992. The Appellant and the children had been residing in a trailer owned by the Appellant's boyfriend. The Appellee then accompanied the children to West Virginia where they have remained for approximately sixteen months.

A hearing was held on August 28, 1992, upon the Appellee's petition for modification of custody and his request that the Appellant be held in contempt of court. By order entered October 29, 1992, the Appellant was held in contempt and custody was granted to the Appellee.

## II.

■ The Appellant contends that the lower court erred in finding that the change of circumstances in this matter justified a change in custody. Pursuant to syllabus point 2 of *Cloud v. Cloud,* 161 W.Va. 45, 239 S.E.2d 669 (1977), "[to] justify a change of child custody, in addition to a change in circumstances of the parties, it must be shown that such change would materially promote the welfare of the child." *Accord, Phillips v. Phillips,* 188 W.Va. 692, 425 S.E.2d 834 (1992); *Judith R. v. Hey,* 185 W.Va. 117, 405 S.E.2d 447 (1990); *Weece v. Cottle,* 177 W.Va. 380, 352 S.E.2d 131 (1986). According to the allegations of the Appellant, no such showing was made by the Appellee. The Appellant further contends that (1) the Appellee is unfit to care for the children, (2) the lower court erred in failing to find the Appellee in contempt for failure to pay his entire obligation of child support, and (3) the lower court erred in finding her in contempt of court.

The Appellant is correct in her assertion that *Cloud* required more than simply a showing of change of circumstances to justify a change in custody. We agree with the lower court that the relocation to Washington could be considered a change of circumstance permitting inquiry into the feasibility of transferring custody, and the Appellant does not appear to argue otherwise. Her argument is, however, well-taken; the existence of a change in circumstance does not automatically justify a change in custody. The Appellant suggests that the lower court was not presented with sufficient evidence to justify its conclusion that a change in custody was warranted.

The evidence adduced at the hearing in the lower court demonstrated several instances in which the Appellant had interfered with the Appellee's rights to visitation. She had been reluctant to provide the Appellee with the new address in Washington, and her interference with visitation arrangements appeared to culminate in her temporary abandonment of her Washington residence in favor of residing with her boyfriend while the children's father was looking for them. While the original problem with the children's flight to West Virginia could be characterized as an unfortunate circumstance for which neither party could be faulted, the Appellant's deliberate act of secreting the children when she had been informed that their father was coming to exercise his visitation rights cannot be so innocently characterized or readily dismissed.[4]

Subsequent to the decision of the lower court, a psychological evaluation performed by Dr. Kenneth N. Asher of Seattle, Wash-

---

When asked if she understood that the Appellee was "coming out to escort them, in effect, be with them, on the return trip to West Virginia, for this eight-week vacation," the Appellant responded affirmatively.

4. Other evidence submitted at the lower court level included a report submitted by the Appellant regarding Nicholas' progress in the first grade in Washington. The teacher's remarks indicated that Nicholas had made a smooth adjustment to the class and had a good attitude.

ington, was obtained by the Appellant.[5] Dr. Asher examined Nicholas and Alexander on December 29, 1992, approximately seven months after their relocation to West Virginia. The boys were ages seven and five at the time of the evaluation and were visiting their mother in Washington for the Christmas holidays. The evaluation had been requested by the Appellant to assess the children's perception of their parents and their own feelings concerning the custody arrangements. The Appellee was not offered an opportunity to participate in this evaluation procedure. Additionally, as Dr. Asher noted in his evaluation, no supporting documents such as school reports, medical reports, neighbor and friend statements, etc. were sought. Dr. Asher observed that the Appellant had other children, ages fifteen and twenty-four, and the Appellee had other children, including a fourteen-year-old daughter residing with him in West Virginia. Dr. Asher noted that despite that fact that Nicholas and Alexander had health concerns including asthma and allergies, the Appellee allegedly smoked cigarettes in the presence of the children.

In the personal interviews with the children, Dr. Asher observed that Nicholas, age seven, stated his preference to remain in Washington with his mother. Nicholas explained that he attended church regularly with his mother and only occasionally with his father. Nicholas described his father as being unavailable to the children, due to his work schedule at his furniture store, his socializing, or his need to do paperwork at home.

Nicholas explained that his mother was a very good cook, that he wished to remain with his mother, and that he did not want to reside with his father. Dr. Asher also noted various indicia of nervous behaviors in Nicholas such as inability to concentrate, demanding of attention, picking at his body, and asthma problems. Alexander, age five, mentioned that he and his brother preferred to

live with their mother and also commented on his father's smoking habit and the social activities which limit the Appellee's ability to spend time with his children.

Dr. Asher concluded that the Appellant could provide a more suitable home for the children. He did note, however, that a full, independent child custody evaluation should be performed by an impartial professional familiar with these children and this family. Dr. Asher also suggested that the Appellee's "living and childrearing environment . . . should be investigated by the appropriate child protective authorities, as it appears to have been neglectful and detrimental to all three children [referencing the Appellee's daughter and the two boys]."

The Appellant has also submitted a report by Dr. Cemil Bayrakci of Tacoma, Washington, in which Dr. Bayrakci explained that physical examination of the children indicated a history of asthma in Nicholas.[6] Dr. Bayakci pointed out that smoking is very detrimental to the health of the children, particularly with their allergies and asthma.

The Appellee also submitted evidence of the children's progress in their school in Buckhannon. In a letter dated April 13, 1993, Nicholas' second-grade teacher described him as a happy, well-adjusted boy. The teacher also remarked that his father had been very involved in Nicholas' education and had contributed materials to the classroom, had visited the class, had attended parent-teacher conferences, and had participated in a Read–Aloud Program.

Alexander's kindergarten teacher from Buckhannon also supplied information, dated April 14, 1993, on Alexander's progress under the care of his father. She indicated that the Appellee had been a helpful and concerned parent and described Alexander to be softspoken, kind, and friendly. She mentioned that Alexander frequently makes crafts and projects with his father and shares them with the class. The Appellee was de-

---

5. Obviously, the lower court did not have the benefit of the evaluation performed by Dr. Asher approximately two months after the final order was entered in the lower court.

6. Once again, the Appellant submitted this report to this Court, and the lower court did not have the benefit of this report in its determination. Dr. Bayrakci did not examine the children until approximately two months after the final order of the lower court was entered.

scribed as an active homeroom father and volunteer for the Read–Aloud Program. The Appellee had also worked with students on unit projects and had served as a chaperon on many field trips.

An affidavit of the Appellee's housekeeper, dated April 19, 1993, was also submitted. She indicated that she had been employed by the Appellee since May 1992 and had performed the duties of laundry, changing bed linens, and general housekeeping tasks on Monday, Wednesday, and Friday for four to five hours per day. She had observed the children's interaction with their father and had noticed that the children always appeared to be in good spirits. They had a good relationship with their father and were always clean and well-dressed.

Affidavits of acquaintances of the Appellee were also submitted. A neighbor, by affidavit dated April 19, 1993, observed that the Appellee was actively involved in the education of the children and was a co-chairman of a PTO fund-raising event. The neighbor also reported that the Appellee had built a go-cart with the boys, had created a fish pond in the yard, and had taken them on numerous outings and trips. The neighbor, a mother of two children near the ages of Nicholas and Alexander, opined that the Appellee was an attentive father and had more time to spend with his children since his recent retirement.

### III.

This case, not unlike most other child custody matters we address, is quite troublesome. The precise question we are asked to answer is whether the lower court was justified in deciding, based upon the evidence before it, that the welfare of the children would be materially promoted by transferring custody from their mother to their father. In addressing this question, we must bear in mind that a determination of custody shall not be set aside absent a showing of clear abuse of discretion. As we explained in syllabus point 2 of *Caraway v. Caraway,* 183 W.Va. 225, 395 S.E.2d 225 (1990), " '[q]uestions relating to alimony and to the maintenance and custody of the children are within the sound discretion of the

court and its action with respect to such matters will not be disturbed on appeal unless it clearly appears that such discretion has been abused.' " Syl., *Nichols v. Nichols,* 160 W.Va. 514, 236 S.E.2d 36 (1977). *Accord, David M. v. Margaret M.,* 182 W.Va. 57, 385 S.E.2d 912 (1989).

When this matter was addressed by the lower court, it had before it evidence of the Appellant's recalcitrance in cooperating with the fulfillment of the visitation rights granted to the Appellee. Despite the lower court's failure to enunciate a specific finding that the children's welfare would be materially promoted by the change in custody, the lower court implicitly so held by determining that the change in custody was warranted and by citing a variety of reasons for his decision. The lower court placed great emphasis on the Appellant's removal of the children from their new home in Washington and her relocation of them to the trailer of her boyfriend for approximately two weeks. The lower court further recognized that she had behaved in this manner despite her knowledge that the Appellee had a right to visit the children during this time and that he was in fact attempting to locate them.

It is extremely unfortunate for these young children that their parents have been unable to cooperate to attain a custody arrangement which would be beneficial to the children. Under the circumstances and upon the evidence presented to the lower court, however, we cannot conclude that the lower court clearly abused its discretion in transferring custody to the Appellee. We have thoroughly reviewed the evidence submitted subsequent to the decision of the lower court, and such evidence does not alter our conclusion in this regard.

Furthermore, we have examined the circumstances under which the lower court determined that the Appellee should not be held in contempt for failure to pay child support. While it was determined that the Appellee was in arrears in child support payments, he tendered payment at the hearing for a large portion of the debt. As of the date of the hearing, the Appellee was in arrears in the amount of $1260. Because he

paid $880 of that amount in the presence of the lower court, the court chose not to hold him in contempt. We also affirm that decision of the lower court.

We consequently affirm the decision of the Circuit Court of Upshur County.

Affirmed.

WORKMAN, Chief Justice, dissenting:

(Filed Dec. 17, 1993)

The majority agrees with the result achieved in the lower court; therefore, it goes to great lengths to justify the legal foundations upon which the decision of the lower court was apparently based.

It may be that modification is in order, but the evidence before the circuit court was entirely inadequate and did not support a change of custody under the standard previously enunciated by this Court.

Legally, this case is extremely uncomplicated. Any change of child custody should be based upon the very simple but sound standard expressed in syllabus point 2 of *Cloud v. Cloud,* 161 W.Va. 45, 239 S.E.2d 669 (1977), as recognized by the majority. That syllabus point states that "[t]o justify a change of child custody, *in addition to* a change in circumstances of the parties, it *must* be shown that such change would *materially promote the welfare of the child.*" (emphasis added). Thus, that syllabus point, like most of our other decisions regarding children and their custody makes the interests and welfare of .the children the chief consideration. There was scant evidence

taken by the lower court on this issue as required by *Cloud,* and there was no real analysis of the issue in the majority's opinion. Furthermore, the Court seemed substantially more concerned about the instability of the mother's domestic life [1] than the father's, although the evidence reflected that the father was rarely available to the children due to his active social and work life.

What got lost in the shuffle was any real examination of the relationship of each party to the children, and any real consideration of their emotional needs.

The lower court, and this Court by tacit approval, relied primarily on the recalcitrance of the mother in accommodating her former husband's visitation rights. The mother was less than cooperative in affording the father his visitation rights. This is a serious matter, not only from the perspective of non-custodial parent's rights, but also from the perspective of the right of a child to a continued relationship with his non-custodial parent.[2] There are other remedies for such non-cooperation, especially when there is not a long track record of it. Recalcitrance in permitting visitation does not in and of itself justify a finding that the best interests of the children would be served by changing their custody.

What was so incredibly absent from those proceedings was any evidence of what level of emotional bond the children had with each parent.

The evidence submitted in connection with the appeal indicated that the children enjoyed a strong emotional bond with their mother and were doing well educationally

1. The lower court cited its concern that the mother had been married three times, and as to her "relationship with Mr. Ayers." Testimony revealed that Mr. Ayers is a man whom the mother had met through her church and had been dating. There was no evidence that she and Mr. Ayers had had sexual relations in the presence of the children and no evidence of any harmful effect of this relationship upon the children. We emphasized in *Judith R. v. Hey,* 185 W.Va. 117, 405 S.E.2d 447 (1990), that such relationship does not raise any presumption against continued custody of the parent originally awarded custody.

2. Family law masters and circuit judges routinely afford noncustodial parents (usually fathers)

grossly inadequate visitation rights. It is difficult to maintain a significant relationship with a child a parent sees only every other weekend, which seems to be the standard court-ordered visitation. As a circuit judge, I felt strongly that noncustodial parents (and their children) were shortchanged when orders of visitation were not fashioned to build a continued relationship between the two. As a Supreme Court Justice, I have spoken before the Judicial Association urging judges to implement visitation schedules designed to accomplish this goal. Children of divorce are obviously far better off if they can continue a relationship with both parents.

and emotionally. The psychological evaluation done subsequent to the evidentiary proceedings and the school reports reflect basically well-adjusted children who were happy with their mother. While it would certainly be unfair to base a custody decision on a psychological report in which the father did not have an opportunity to participate, this was the kind of evidence that should have been presented by both sides and considered by the lower court.

For far too long, courts (historically habituated by well-meaning men over fifty who come from an era where the father did little of the nurturing of children) have treated child custody disputes in almost every context as competing sets of adults' rights, with little real consideration of the emotional needs and wants of the children.

It is not suggested here that young children be required to express preferences, as that usually only aggravates children's already-divided loyalties and torn emotions. But rather than examining parents in a good guy-bad guy analytical framework (since in so many of these cases, there are no good guys or bad guys), courts should look at the emotional lives of the children. Who do they cry for at night when they are sick? Who do they want to run to when there's happy news to share? In short, with whom are the children most closely bonded?

The scanty evidentiary record before us was manifestly inadequate to demonstrate that a change of custody would materially promote the welfare of the children. Thus, neither the legal nor human standard was met to make such an immense and dramatic change in the lives of these little boys. This case should have been remanded for the taking of evidence on their best interests.