452 S.E.2d 404

**April L. DiMAGNO, Petitioner Below, Appellant,**

v.

**Andrew Patrick DiMAGNO, Respondent Below, Appellee.**

No. 22059.

Supreme Court of Appeals of West Virginia.

Submitted Oct. 4, 1994.

Decided Dec. 8, 1994.

---

Peter J. Conley, Siegrist, Spelsberg, White, Martin & Conley, Clarksburg, for appellant.

Charles K. Grant, Henry Grant Taylor & Janelle, Martinsburg, for appellee.

PER CURIAM:

April DiMagno appeals the final order of the Circuit Court of Berkeley County awarding her former husband, Andrew Patrick DiMagno, custody of the parties' infant daughter, Aryn DiMagno, who was born January 28, 1987. The circuit court found Mrs. DiMagno, the child's primary caretaker, to be unfit based on her alleged use of "extreme discipline" with Aryn and her cohabitation with T.A.P., who was arrested for indecent exposure. On appeal, Mrs. DiMagno asserts that the circuit court abused his discretion in failing to award her custody of Aryn because the evidence does not show she is unfit. Because the record does not support the finding of unfitness, we reverse the circuit court's decision concerning custody. Although we find that Mrs. DiMagno should be awarded custody, we agree with the part of the circuit court's order prohibiting the child to be unsupervised when she is in the presence of T.A.P., Mrs. DiMagno's boyfriend.

I

After eight years of marriage on February 1, 1993, Mr. and Mrs. DiMagno divorced on the grounds of irreconcilable differences. Mr. and Mrs. DiMagno have one daughter, Aryn, born in 1987. At the November 19, 1991 *pendente lite* hearing, the family law master granted Mrs. DiMagno custody of Aryn. Mr. DiMagno, who did not attend that hearing, filed a motion for reconsideration and on January 27, 1992, the family law master held another *pendente lite* hearing during which both Mr. and Mrs. DiMagno requested custody of Aryn. During the January 27, 1992 hearing, Mr. DiMagno testified that Mrs. DiMagno went out a lot and was involved with T.A.P., who had been arrested for indecent exposure with a fifteen year old girl. Mr. DiMagno said that Aryn appeared to have been coached on her statements concerning Mrs. DiMagno's boyfriend. When

asked about who disciplines Aryn, Mr. DiMagno replied:

> I would say I was. April liked to let a lot go by. She would discipline her but generally as far as putting your foot down, teaching manners, I disciplined her myself.

Based on the parties' agreement, the family law master ordered Mrs. DiMagno to be the primary custodial parent with liberal visitation by Mr. DiMagno. A home study was ordered. The family law master also ordered that Mrs. DiMagno's boyfriend was not to have any unsupervised visits with Aryn.

At the September 10, 1992 hearing before the family law master, Marcia Kemner, M.A., a licensed social worker who conducted the court ordered home study, testified that she had interviewed the parties, the parties' families, Aryn, numerous acquaintances and friends. Ms. Kemner concluded that "the child has a closer bond with the mother and that it would be detrimental for her to be separated from the mother ... and I believe that Mrs. DiMagno is best suited as custodian." Ms. Kemner also noted that although Aryn is very close to her father, "her grandma [Mr. DiMagno's mother] takes case of her" when she visits her father. According to Ms. Kemner, Aryn prefers living with her mother.

During the September 10, 1992 hearing, Mr. DiMagno testified for the first time about the "extreme discipline" used by Mrs. DiMagno. According to Mr. DiMagno, his parents and several other witnesses, they saw Mrs. DiMagno "slap" or "smack" Aryn. However, none had reported the discipline issue until this hearing. Mrs. Kemner, who interviewed five of the witnesses during her home study, specifically questioned each witness about child abuse and neglect and none of these witnesses told her that Mrs. DiMagno had abused, neglected or improperly disciplined Aryn.[1] Mrs. DiMagno presented several witnesses who testified about her excellent relationship with her daughter. All of Mrs. DiMagno's witnesses denied ever seeing any evidence of abuse or neglect. In fact several witnesses testified that Mrs. DiMagno was too lax in disciplining Aryn. Mrs. DiMagno acknowledged that sometimes she disciplined Aryn by tapping or patting Aryn about the face, but denied slapping her.

At a later hearing, a child protective services worker from the W.Va. Department of Health and Human Resources testified that she had investigated a complaint from an undisclosed person alleging that Mrs. DiMagno had abused and neglected Aryn. The investigator found the relationship between mother and daughter to be "very loving" and concluded that the complaint was groundless.

The family law master also heard testimony concerning T.A.P., with whom Mrs. DiMagno allegedly lived. Mrs. DiMagno acknowledged her involvement with T.A.P. but insisted that although she had spent one or two nights with him on a few occasions, she was not living with him. The record shows that T.A.P. was arrested for indecent exposure and pled no contest to a charge of disorderly conduct in connection with an incident involving a fifteen year old girl, who was babysitting his children. Based on the girl's testimony and the police record, the family law master found that Mrs. DiMagno's cohabitation with T.A.P. was "adverse to the best interests of the said infant child of the parties and further casts doubt upon the plaintiff's fitness to have custody of said child." Mrs. DiMagno noted that T.A.P. has unrestricted visitation with his children and denied that their relationship had a deleterious effect on Aryn.

Based on extensive testimony, the family law master found that although both parties cared for and nurtured Aryn, Mrs. DiMagno spent more time and was more intimately involved with Aryn and her activities. After concluding that Mrs. DiMagno was Aryn's primary caretaker, the family law master found Mrs. DiMagno to be unfit because of her alleged excessive discipline and her relationship with T.A.P. The family law master rejected Mrs. DiMagno's assertion that Mr. DiMagno's interference with her temporary custody made him an unfit parent. Appar-

---

1. Mr. DiMagno's parents both testified that they told Mrs. Kemner about Mrs. DiMagno's "use of extreme discipline."

ently, Mr. DiMagno misconstrued the terms of a previous temporary custody order and, without informing Mrs. DiMagno, took Aryn on vacation out of West Virginia. The family law master also found that Mr. DiMagno accidently struck Mrs. DiMagno when she attempted to retrieve Aryn after her father took Aryn, without notice, from her mother's unattended car, which was parked outside Aryn's school.

After reviewing Mrs. DiMagno's objections to the recommended decision and Mr. DiMagno's response, the circuit court adopted the family law master's recommendations and found that because Mrs. DiMagno was unfit, Mr. DiMagno should be awarded custody of Aryn. The circuit court also ordered Mrs. DiMagno "not to permit her said boyfriend, T.A.P., to have unsupervised contact with the said infant child of the parties...." Alleging that she is a fit parent, Mrs. DiMagno appealed to this Court.

## II

█ This case's primary issue concerns the custody of the parties' child. Mrs. DiMagno maintains that the circuit court abused his discretion in adopting the family law master's finding that she is an unfit parent. In *David M. v. Margaret M.*, 182 W.Va. 57, 385 S.E.2d 912 (1989), we reiterated our long standing rule that matters of child custody are within the sound discretion of the circuit court. In Syl. pt. 1, *David M.*, we stated:

"The exercise of discretion by a trial court in awarding custody of a minor child will not be disturbed on appeal unless that discretion has been abused: however, where the trial court's ruling does not reflect a discretionary decision but is based upon an erroneous application of the law and is clearly wrong, the ruling will be reversed on appeal." Syllabus Point 2, *Funkhouser v. Funkhouser*, 158 W.Va. 964, 216 S.E.2d 570 (1975).

*In accord* Syl. pt. 3, *John D.K. v. Polly A.S.*, 190 W.Va. 254, 438 S.E.2d 46 (1993); Syl. pt. 4, *Judith R. v. Hey*, 185 W.Va. 117, 405 S.E.2d 447 (1990). *See also* Syl. pt. 2 *Wood v. Wood*, 190 W.Va. 445, 438 S.E.2d 788 (1993) ("[q]uestions relating to alimony and

to the maintenance and custody of the children are within the sound discretion of the court and its action with respect to such matters will not be disturbed on appeal unless it clearly appears that such discretion has been abused."); Syl. pt. 8, *Wyant v. Wyant*, 184 W.Va. 434, 400 S.E.2d 869 (1990); Syl., *Luff v. Luff*, 174 W.Va. 734, 329 S.E.2d 100 (1985); Syl., *Nichols v. Nichols*, 160 W.Va. 514, 236 S.E.2d 36 (1977).

█ However the circuit court's discretion must be guided by the presumption that "it is in the best interest of ... [very young children] to be placed in the custody of their primary caretaker, if he or she is fit." Syl. pt. 2, in part, *Garska v. McCoy*, 167 W.Va. 59, 278 S.E.2d 357 (1981). *In accord*, Syl. pt. 2, *David M.*, *supra*.

█ In this case, the circuit court, after finding Mrs. DiMagno to be the primary caretaker, held that she was unfit. In *David M.*, 182 W.Va. at 68, 385 S.E.2d at 924, we noted that in determining whether a parent is "fit," a "court is not concerned with assessing relative degrees of fitness between two parents such as might require expert witnesses, but only whether the primary caretaker achieves a passing grade on an objective test." The following is the objective test for parental fitness, outlined in Syl. pt. 5, *David M.*:

To be considered fit, the primary caretaker parent must: (1) feed and clothe the child appropriately; (2) adequately supervise the child and protect him or her from harm; (3) provide habitable housing; (4) avoid extreme discipline, child abuse, and other similar vices; and (5) refrain from immoral behavior under circumstances that would affect the child. In this last regard, restrained normal sexual behavior does not make a parent unfit.

*See Garska*, *supra*, 167 W.Va. at 70, 278 S.E.2d at 361.

█ In the present case, the circuit court found Mrs. DiMagno to be unfit based on allegations of extreme discipline and her continued association with T.A.P. The evidence of Mrs. DiMagno's alleged extreme discipline was presented by Mr. DiMagno, his family and friends. They alleged that Mrs. DiMag-

no had "slapped" or "smacked" the child as a routine form of discipline. Mr. DiMagno's mother and girl friend testified that they had seen marks on the child's legs allegedly made by Mrs. DiMagno using a fly-swatter. However, none of these allegations was presented until the September 10, 1992 hearing even though these same witnesses were interviewed by Mrs. Kemner, an impartial social worker, during her investigation and home study. Mrs. Kemner testified that she received negative responses from all witnesses to her specific questions about possible abuse and neglect. The investigation of a complaint of abuse against Mrs. DiMagno by the Department of Health and Human Resources failed to disclose any such abuse or neglect. Even Mr. DiMagno failed to mention this extreme discipline issue when he first testified before the family law master. We also note that several of Mrs. DiMagno's witnesses thought Mrs. DiMagno to be lax in discipline matters and denied seeing any abuse or neglect. Based on the totality of the evidence, especially the reports of the two independent investigations, we find that the circuit court abused his discretion in finding Mrs. DiMagno to be unfit based on unfounded allegations of abuse.

The circuit court also found that Mrs. DiMagno's relationship with a man who had been arrested for indecent exposure rendered her an unfit mother. In Syl. pt. 7, *David M., supra*, we discussed the relationship between a parent's adultery and parental fitness:

> "Acts of sexual misconduct by a [primary caretaker], albeit wrongs against an innocent spouse, may not be considered as evidence going to the fitness of the [caretaker] for child custody unless [his or] her conduct is so aggravated, given contemporary moral standards, that reasonable men would find that [his or] her immorality, *per se*, warranted a finding of unfitness because of the deleterious effect upon the child of being raised by a [primary caretaker] with such a defective character." Syllabus Point 4, *J.B. v. A.B.*, 161 W.Va. 332, 242 S.E.2d 248 (1978) as modified by *Garska v. McCoy*, 167 W.Va. 59, 70, 278 S.E.2d 357, 363 (1981).

Although the record indicates that Mrs. DiMagno's boyfriend was involved in sexual misconduct involving a fifteen year old girl, there was not evidence that this incident involved Mrs. DiMagno or her daughter. Although we agree with the family law master and circuit court that T.A.P. should be prohibited from having unsupervised visitation with Aryn, we find that by itself Mrs. DiMagno's relationship with T.A.P. is insufficient to justify finding Mrs. DiMagno to be an unfit parent. We, therefore, find that the circuit court abused his discretion in finding Mrs. DiMagno to be an unfit parent and in awarding Mr. DiMagno custody of Aryn.

For the above stated reasons, we affirm the part of the circuit court's decision ordering no unsupervised visitation occur between Aryn and Mrs. DiMagno's boyfriend, but we reverse the part of the circuit court's decision awarding custody of the child to Mr. DiMagno, and we remand this case for proceedings consistent with this opinion.

Affirmed, in part, reversed in part and remanded.

BROTHERTON, C.J., did not participate.

MILLER, Retired J., sitting by temporary assignment.